STATE OF NEBRASKA, APPELLEE, v. CARL GOODWIN
WILLIAMS, APPELLANT.

159 N. W. 2d 549

Filed June 14, 1968. No. 36798.

Fred R. Irons, Lawrence S. Dunmire, and David N. Shepherd, for appellant.

Clarence A. H. Meyer, Attorney General, and Melvin K. Kammerlohr, for appellee.

Heard before, WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

SPENCER, J.

Defendant was convicted of murder in the first degree while attempting to perpetrate a burglary, and has perfected an appeal to this court.

Mae Ritchie, an 81-year-old woman, hard of hearing, and living alone on the outskirts of the city of Hastings, was found dead in her home about 9:35 a.m., December 10, 1966. She had last been seen alive around 9 o'clock Thursday morning, December 8, 1966. She was found lying on the floor near her bed, with her body covered by clothing and other articles, including the contents of a dresser drawer. She was clothed in a silk night-

gown and a flannel housecoat. She had been severely beaten and had numerous contusions about her head and face, particularly the eyes, nose and mouth. Death was attributed to asphyxiation, or the inability to breathe because of obstruction by bloody mucus. The medical examiner testified that she had apparently received numerous blows by a blunt instrument. No instrument was ever found.

The defendant, an itinerant worker, was temporarily staying at the Harry D. Johnson residence which is approximately 100 feet north and east of the Ritchie residence. On two or three previous occasions he had done farm work and chores for Johnson. Defendant returned to Hastings sometime in November 1966, but because Johnson had no work for him he was doing occasional chores for his board and room until he could make other arrangements.

The window in deceased's bedroom, which was located about 5 feet above the surface of the ground on the south side of the house, was open approximately 15 or 16 inches. The storm cloth covering the outside portion of the window had been cut and ripped down the east side, and apparently pulled or pushed back out of the way. Fingerprints were found inside the house, but they were smudged and could not be classified. While checking the bed for fingerprints, an officer discovered a man's tan winter cap which appeared to have bloodstains on it. This cap was later identified by several witnesses as belonging to the defendant.

A pathologist who performed an autopsy on the deceased fixed the time of the death somewhere between a maximum of 48 hours and a minimum of 36 hours before the time of his examination, which was at 1:30 p.m. on December 10, 1966. He considered the minimum of 36 hours as the more logical figure. This would place the murder at sometime after 1:30 p.m., December 8, and before 1:30 a.m., December 9, 1966, with the more likely time the evening of December 8, 1966.

Raymond Hock, who was living at the Johnson residence, took defendant to town shortly before 3 p.m., December 8, 1966. Hock next saw defendant at approximately 5 p.m. Defendant at that time was under the influence of intoxicating liquor, but Hock continued with his chores and paid no attention to him.

Harry Johnson testified defendant had come home about 5 p.m., staggering, and was almost incoherent. Johnson finally made out that someone had hit the defendant, and he noticed that defendant was bleeding under the jaw. Johnson told defendant to go up to the house, get the bleeding stopped, clean up and rest, and if he wanted to get his things and go it was all right with him.

Mrs. Johnson saw defendant about 6:30 p.m., sitting on the floor of his room, apparently asleep. Defendant came downstairs where Hock was watching television about 8 p.m., and Hock bandaged up his wound. At that time, defendant was obviously still under the influence of liquor, fell off a chair, but was able to get up without assistance.

Defendant left the Johnson residence about 9 p.m., December 8, 1966. Hock testified that when defendant left he was wearing the cap in evidence. Defendant attempted to impeach this testimony by some alleged oral inconsistent statements previously made to defendant's attorneys, but Hock was positive defendant had his cap when he left at 9 p.m. Defendant returned to the Johnson residence at approximately 11 p.m. that evening. When he came in the house, he got down on his knees in front of Hock, started to cry, and said: " 'Ray' * * * 'You're my friend,' * * *." At this time defendant told Hock he had lost his cap and subsequently he was apparently looking around the house for it. At approximately 1 a.m., December 9, 1966, defendant told Hock: " 'I'm going downtown.' " Hock told him: " 'Carl, there ain't nothing downtown open.' " Defendant said: " 'I don't care, I'm going down anyway.' " Defendant left,

and was not seen by anyone at the Johnson residence until approximately noon on December 9, 1966.

The Johnsons' daughter and granddaughter who were visiting the Johnson home Saturday morning, December 10, 1966, had noticed some activity at the Ritchie residence, and commented on it. While they were watching that activity with the defendant from a window in the Johnson residence, the defendant said: " 'Probably someone thought she had a lot of money living here alone, but they probably got "a foolin".' " This was at a time when no one present at the Johnson residence had any idea there had been an attempted burglary and murder.

Defendant left the Johnson residence sometime late Monday morning, December 12, 1966, ostensibly to go to the employment office in Hastings, and was not seen again. He did not take his suitcase and other belongings. He had left clothes at the Johnson residence before but never his suitcase.

Defendant was apprehended in Denver, Colorado, January 13, 1967, by an FBI agent who told him he had a warrant for his arrest for unlawful flight to avoid prosecution from the State of Nebraska. When the agent told defendant he was wanted on charges in Nebraska, defendant said: "* * * he didn't have anything to worry about; he hadn't been in Nebraska since June of 1966."

Defendant's first assignment of error is the overruling of his motion for discovery, in which he sought copies of the original notes of the arresting officers; all police reports containing statements of witnesses and copies of all statements of the defendant and other witnesses; autopsy reports; chemical analyses; blood tests; fingerprints; and all physical evidence in the possession of the State. Essentially, the motion requested an inspection of all of the State's evidence. We have not yet reached the point in this state where the county attorney is required to give his entire work product to the defense. In Cramer v. State, 145 Neb. 88, 15 N. W. 2d 323, we said: "The defense counsel in a criminal prose-

cution have no right to inspect or compel the production of evidence in the possession of the state unless a valid reason exists for so doing. The defendant has no inherent right to invoke this means of examining the state's evidence merely in the hope that something may be uncovered which would aid his defense."

Cramer v. State, *supra*, enunciated the rule, which is still the law in this jurisdiction: "In a criminal case the trial court is invested with a broad judicial discretion in allowing or denying an application to require the state to produce written confessions, statements and other documentary evidence for the inspection of defendant's counsel before the trial. Error may be predicated only for an abuse of such discretion." There was no abuse of discretion herein.

Defendant's second assignment of error is the contention that the trial court should have sustained his motion for dismissal at the close of the State's case. Admittedly, the evidence herein is not wholly without some doubt, being strictly circumstantial, but it certainly is sufficient for its submission to a jury and for a jury to reach a conclusion that the defendant was guilty beyond a reasonable doubt. "A person charged with crime may be convicted on circumstantial evidence only." State v. Ohler, 178 Neb. 596, 134 N. W. 2d 265. In that case, we said: "It is the province of the jury to determine the circumstances surrounding, and which shed light upon, the alleged crime; and if, assuming as proved the facts which the evidence tends to establish, they can be accounted for upon no rational theory which does not include the guilt of the accused, the proof cannot, as a matter of law, be said to have failed."

Crimes such as murder are usually secretive, and it is the unusual case which occurs in the presence of witnesses. Consequently, there can always be some doubt as to whether a defendant should be convicted on circumstantial evidence. As we said in State v. Ohler, *supra*: "To justify a conviction on circumstantial evi-

dence it is necessary that the facts and circumstances essential to the conclusion sought must be proved by competent evidence beyond a reasonable doubt, and when taken together must be of such a character as to be consistent with each other and with the hypothesis sought to be established thereby, and inconsistent with any reasonable hypothesis of innocence."

In State v. Ohler, *supra,* we restated what has long been the rule in this jurisdiction: "After a jury has considered the evidence in the light of the foregoing rules and returned a verdict of guilty, the verdict on appeal may not, as a matter of law, be set aside for insufficiency of the evidence if the evidence sustains some rational theory of guilt."

In this case it was clearly established that decedent met her death sometime between 1:30 in the afternoon of Thursday, December 8, and 1:30 a.m., Friday, December 9, 1966. A man's cap with blood splatters on it was found in the bed of decedent. Several witnesses identified the cap as belonging to the defendant, and one witness had defendant wearing the cap at 9 p.m., Thursday, December 8, 1966. Defendant was emotionally upset when he returned at 11 p.m. without his cap. After he could not find his cap at the Johnson residence, he left at 1 a.m., Friday, December 9, ostensibly to go downtown, and was not seen until late that morning. An FBI expert, who had conducted an analysis of defendant's hair and hairs from the cap, testified that the hairs from the cap were those of the defendant or of someone whose hair was identical with his.

When defendant was arrested in Colorado and advised of the charges against him, he denied having been in Nebraska during the period involved. It is also of more than passing interest that at a time when no one had been informed that a crime had been committed, the defendant, in looking out of a window in the Johnson residence at the activity in the home of the deceased, stated: " 'Probably some one thought she had a lot of money

living here alone, but they probably got "a foolin".' "

Defendant left the Johnson residence Monday morning, stating that he was going down to the employment agency, and disappeared. While it was not unusual for the defendant to leave the Johnsons on sudden impulse, it was unusual for him to leave without taking his suitcase. Defendant's motion to dismiss was properly overruled.

Defendant's third assignment of error is that the State failed to disclose the existence of a witness whose testimony was material to his defense. Subsequent to the trial, defendant's attorneys learned the name of a witness who had fought with the defendant near the Johnson residence on the afternoon of December 8, 1966, and who was responsible for the cut under defendant's jaw. It is the defendant's contention that the State suppressed this evidence by not disclosing the name of the witness to the defendant before or at the trial.

The affidavit of the witness was filed herein. It indicates that the witness was contacted by the county attorney a week before the trial and informed that he was to be a rebuttal witness in the case. The witness was present at the Adams County courthouse during the trial and at all times was available as a witness. After the defendant rested his case without putting on any testimony, the county attorney informed this witness that he would no longer be needed because he could not be used as a rebuttal witness.

The affidavit of defendant's attorney states that this witness told him he didn't think defendant had a cap on when he struck him, but thought the cap was lying on the ground; and that after he struck the defendant, and while the defendant was still lying on the ground, he left the scene. If this testimony had been adduced, it would have confirmed that the defendant had been in a fight before 5 p.m., December 8, 1966, and that his cap was on the ground with the defendant when the

witness departed. The affidavit of the witness states that he at no time saw the cap. However, the State's case is premised on the fact that defendant was wearing the cap found in the bed of the deceased when he left the Johnson home at 9 p.m., December 8, 1966, or more than 4 hours after that fight. This is the incriminating link to the defendant. Also, the reasonable inference from the testimony of the pathologist is that the murder was committed in the evening or night rather than the afternoon of December 8, 1966.

We do not feel that this record supports defendant's contention that the county attorney willfully suppressed any evidence. The trial strategy of the county attorney involved the production of this witness as a rebuttal witness. The failure of the defendant to adduce any testimony in his defense foreclosed the possibility of rebuttal testimony.

For the reasons given above, we find no merit to any of the defendant's assignments of error, and affirm the judgment.

AFFIRMED.

SMITH and McCOWN, JJ., concurring in result.

The State offered little or no evidence of some tests, and defendant says that the State may have suppressed evidence of his innocence. Although we cannot now approximate some effects of nondisclosure, the denial of inspection in view of our prior decisions was not erroneous. Precedent has almost given the district court *carte blanche* to refuse inspection. That policy which is reinforced by the majority opinion should be prospectively revised. An accused should ordinarily have a right at least to inspect and copy reports on scientific tests of physical objects and conditions. Cf. Fed. R. Crim. p. 16.