STATE OF NEBRASKA, APPELLEE, v. THOMAS F. DAVIS, APPELLANT.

176 N. W. 2d 657

Filed April 24, 1970. No. 37290.

Mitchell & Beatty, for appellant.

Clarence A. H. Meyer, Attorney General, and Melvin K. Kammerlohr, for appellee.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

BOSLAUGH, J.

The defendant, Thomas F. Davis, was convicted of first degree murder and sentenced to life imprisonment. His motion for new trial was overruled and he has appealed.

The defendant has filed a lengthy brief containing many assignments of error. In disposing of the appeal we will discuss only those assignments of error which merit or require discussion.

The body of Phyllis Davis, the wife of the defendant, was found at about 2:30 a.m., on August 14, 1968, in a station wagon owned by the defendant. The automobile was in a ditch at an intersection of county roads approximately 3 miles southeast of Grand Island, Nebraska.

The State produced evidence from which the jury could find that the deceased had been severely beaten with a blunt instrument. A pathologist testified that approximately three-fourths of the circumference of the head showed evidence of fresh or very recent lacerations, bruises, cuts, and abrasions. There was a stellate fracture of the skull, about 1 inch in diameter, above the left ear. Death resulted from loss of blood from the lacerations about the head, and would not have occurred if appropriate medical treatment had been administered.

The automobile was found in the west ditch of the north-south road headed in a westerly direction. An east-west road joins the north-south road at the intersection but does not continue to the west of the north-south road.

There was some front-end damage to the automobile, primarily to the radiator and air-conditioning condenser which had struck a projection on a log or tree lying in the ditch. The front bumper of the automobile had been damaged in a previous accident and been removed. The jury could find that the automobile had entered the ditch at a relatively low rate of speed and had been placed in the ditch in an attempt to create the appearance that the deceased had died as the result of injuries sustained in an automobile accident.

The evidence was clearly sufficient to sustain a finding that the deceased had died as the result of having been severely beaten and left to die from loss of blood.

The defendant and Phyllis were married in 1959. Since 1961 they have lived in the Grand Island, Nebraska, area where he has held the franchise for Hobart Sales and Service. Phyllis worked in the office and helped

with the customers when the defendant was not in the store.

A bank officer testified that 76 checks drawn on the Hobart Sales and Service bank account were returned for insufficient funds during the first 7 months of 1968. Of these checks, 28 were returned in May and 21 in June.

The State produced evidence which showed that the defendant had been having sexual relations with Cheryl Crane on an average of about once a week since February 1968. On April 6, 1968, Phyllis learned of the relations between the defendant and Mrs. Crane. At that time Phyllis agreed to give the defendant a divorce if he did not see Mrs. Crane for 6 months. The defendant did not keep the agreement and called Mrs. Crane the next day. In June 1968, Mrs. Crane separated from her husband and moved to near Hickman, Nebraska. While she was living near Hickman, Mrs. Crane corresponded with the defendant three or four times a week by mailing his letters to Herman Jungclaus.

Sometime in June the defendant wrote to Mrs. Crane stating that he would not be writing to her in the future. The defendant had told Mrs. Crane to disregard this letter and explained that Phyllis had found out about their correspondence and that the letter was sent at the request of Phyllis. The defendant continued his relations with Mrs. Crane as before, and later she mailed his letters to general delivery at Hastings. The defendant had previously said that he would be divorced in the fall and he and Mrs. Crane had agreed to each get a divorce and marry each other.

On May 6, 1968, the defendant and Phyllis applied to Northwestern Mutual Life Insurance Company for $50,000, 10-year term, life insurance policies. These policies were never issued.

On June 6, 1968, the defendant and Phyllis made application to Prudential Insurance Company for $50,000 term insurance policies. Both policies provided double

indemnity for accidental death. Her policy was issued June 24, 1968, with the defendant as beneficiary.

On August 7, 1968, the defendant purchased travel accident insurance policies in the amount of $50,000 insuring Phyllis and himself for 15 days from August 8, 1968. The defendant was the beneficiary on the policy insuring Phyllis. An employee of the agency that issued the policies testified that the defendant said they would be in and out of town for a few days at a time and not going any specific place or be gone any length of time.

On August 13, 1968, the defendant and Phyllis purchased mortgage life insurance policies in the amount of $5,000. The defendant was the beneficiary on the policy insuring Phyllis. They were purchasing a property from Jungclaus Enterprises, Inc., on contract for $5,000 and a warranty deed naming them as grantees in joint tenancy had been deposited with an escrow agent by the vendor.

During the conversation with the agent who sold the mortgage insurance, the defendant and Phyllis said that they were leaving on a trip to California the next day. On August 7, 1968, Phyllis had written to the defendant's mother in Lincoln, Nebraska, inquiring if she could take care of two of the boys because the defendant and Phyllis were going on a trip from August 12 to about August 22.

A service and delivery man employed by the defendant testified that he last saw Phyllis at about 5 p.m., on August 13, 1968. Phyllis told this employee that the defendant was in Lincoln; that the defendant was to be back around noon the next day; and that they were planning to leave on a trip at 2 p.m.

Patricia Ewers, a sister of Phyllis Davis, testified that she last saw Phyllis at about 6:30 p.m., on August 13, 1968. Phyllis was planning to leave the two small children with Patricia the next day when they left on their vacation.

The defendant arrived at his mother's tailor shop in

Lincoln, Nebraska, at about 5:30 p.m., on August 13, 1968, with two of the children. After stopping at his parents' home, he borrowed their automobile and drove out to see Mrs. Crane near Hickman, Nebraska. He arranged to meet Mrs. Crane in Lincoln later that evening and returned to his parents' home.

The defendant had dinner at his parents' home and then left at about 8:30 p.m. to meet Mrs. Crane. They spent several hours together and were to meet each other for breakfast at 8:30 a.m. the next morning. The defendant had said that they would have breakfast and "fool around with the kids in the morning and maybe possibly have lunch together." The defendant said nothing to Mrs. Crane about a vacation that was to begin the following day.

The defendant returned to his parents' home and called Phyllis in Grand Island. The call was placed at 10:53 p.m., collect, station-to-station, to the defendant's residence in Grand Island. The defendant's mother testified that she and the defendant and the two children talked with Phyllis. She further testified that the defendant remained in their presence until about 2:30 a.m. when he retired. She also testified that she was up once in the night to see about the children and that she saw the defendant was in bed at that time.

At about 6 a.m. a deputy sheriff called the defendant and advised him that Phyllis was dead. The defendant then returned to Grand Island.

Stacia Larson, a friend of the defendant and Phyllis, testified that she stopped at the defendant's home at about 10:30 or 11 a.m., on August 14, 1968. The witness expressed her sympathy to the defendant and asked if he knew what time it happened. The defendant replied, " 'yea, between ten-thirty and eleven.' " This is the only evidence in the record which fixes the time of death of Phyllis with any degree of certainty. The defendant also said to this witness that he had taken two of the children to Lincoln and had planned on coming

back, but that something came up and he wasn't going to come until this morning. He further stated that they were going to leave at twelve or eleven for California.

It was customary for Phyllis to wear glasses. When her body was removed from the automobile and taken to the funeral home the glasses were not found. They were found by Victor Dembowski and Robert Dembowski, an uncle and cousin of Phyllis, at about 6 p.m., on August 14, 1968. The glasses were lying in the ditch in the grass, approximately 3 feet north of where the passenger side of the automobile had been, in a path or area that had been tramped down by people walking in and out of the ditch. The glasses were in plain view from the road but had not been seen by a patrolman who had photographed the same area about an hour before the glasses were found.

The Dembowskis returned to the intersection at about 8 p.m. The glasses were still there. They picked them up and Mrs. Dembowski took them home with her. She called Mrs. Ewers the next morning and told her that the glasses had been found.

The defendant's mother testified that the Dembowski family was at the defendant's home on Wednesday evening, August 14, 1968, and told her that they had found the glasses. Mrs. Dembowski denied that and testified that the first time she told anyone that the glasses had been found was when she called Mrs. Ewers on Thursday morning.

The defendant's mother further testified that Mrs. Ewers called on Thursday morning and said that the glasses had been found. She then gave this information to the defendant.

The defendant, with his lawyer, was in the county attorney's office at about 11 a.m., on August 15, 1968. There was some discussion about two automobile accidents in which Phyllis had been involved. The county attorney stated that Phyllis had probably been wearing her glasses on those occasions. The defendant then vol-

unteered, " 'and she was wearing them this time too.' "

The foregoing is a summary of the principal evidence which implicates the defendant in the death of his wife. The State had no evidence which placed the defendant at the scene of the crime. Such evidence was not essential because one who incites or instigates the commission of a felony, although neither actually or constructively present, is an aider, abettor, or procurer and may be prosecuted and punished as if he were the principal offender. § 28-201, R. R. S. 1943; Callies v. State 157 Neb. 640, 61 N. W. 2d 370; Neal v. State, 104 Neb. 56, 175 N. W. 669. The crime may be proved by circumstantial evidence. Lamb v. State, 69 Neb. 212, 95 N. W. 1050; Callies v. State, *supra*.

The defendant argues that he cannot be convicted as an aider and abettor because the evidence does not identify the principal or person who actually killed the deceased. The actual perpetrator of the crime need not be identified. The evidence is sufficient if it shows that the crime was committed by someone and the defendant aided and abetted in its commission. Von Patzoll v. United States, 163 F. 2d 216; Spies v. People, 122 Ill. 1, 12 N. E. 865; Howard v. Commonwealth, 110 Ky. 356, 61 S. W. 756; 22 C. J. S., Criminal Law, § 100, p. 279.

The evidence of the State is circumstantial. A person charged with crime may be convicted on circumstantial evidence only, and if the facts which the evidence tends to establish may be accounted for upon no rational theory which does not include the guilt of the accused, the evidence is sufficient to sustain the conviction. State v. Williams, 183 Neb. 257, 159 N. W. 2d 549. The credibility of the witnesses and the weight of their testimony are for the jury.

The evidence against the defendant is substantial. He was engaged in an extra-marital affair with Mrs. Crane which commenced at about the time of the birth of his last child and continued beyond the death of his wife. He had said that he would be divorced in the. fall and

would marry Mrs. Crane. His business was in financial difficulty. He purchased insurance coverage upon Phyllis which would pay him $155,000 in the event of her death by accident. The jury could find that this evidence is inconsistent with any reasonable hypothesis except that of guilt.

Phyllis was killed in a manner such as to suggest a fatal automobile accident, but the automobile, which was a 1968 Oldsmobile owned by the defendant, suffered relatively minor damage. The defendant made little or no inquiry of the officials who investigated the crime to find out how the "accident" happened.

The defendant's statement to Mrs. Larson concerning the time when Phyllis was killed and his statement in the county attorney's office to the effect that Phyllis was wearing her glasses when she was killed tend to show guilty knowledge. His statements when purchasing the travel accident policies and the fact that he said nothing to Mrs. Crane on Wednesday evening about the California vacation, that Phyllis thought was going to begin the next day, permits an inference that he knew that there was to be no trip to California commencing on Thursday.

The evidence, although not conclusive, was sufficient to sustain a finding beyond a reasonable doubt that the defendant was guilty as an aider, abettor, or procurer in the murder of his wife.

The defendant called a number of witnesses who testified concerning the extra-marital activities of Phyllis. Several witnesses testified concerning her relations with Merle Booth, also known as "Pete" Booth. Vernie Lorene Allen, a bartender at the Peacock Inn, testified that she had introduced Phyllis to Booth at Phyllis' request. There was testimony that Booth and Phyllis were together on a number of occasions and that Phyllis had loaned $50 to Booth.

Booth, who was a staff sergeant in the Air Force, left Grand Island in June 1968. There was some evidence

that Booth was in Grand Island on August 15, 1968.

On rebuttal, the State called a safety patrolman who was allowed to testify, over objection, that he called the Fitzsimmons General Hospital in Denver, Colorado, and talked with a Dr. Stutz who said that Booth was there on the night of August 13 and 14. The defendant then moved to strike this testimony and the motion was overruled.

The testimony was clearly hearsay and not admissible. Donner v. State, 69 Neb. 56, 95 N. W. 40; Rogers v. State, 97 Neb. 180, 149 N. W. 318, L. R. A. 1915B 1125. In addition thereto, it was a violation of the defendant's right to be confronted by the witnesses against him. Art. I, § 11, Constitution of Nebraska; 23 C. J. S., Criminal Law, § 999, p. 1041. The right of an accused to confront the witnesses against him is also a federal constitutional right under the Sixth and Fourteenth Amendments to the United States Constitution. Pointer v. Texas, 380 U. S. 400, 85 S. Ct. 1065, 13 L. Ed. 2d 923.

The State does not contend that the testimony was admissible but argues that the error was not prejudicial. The evidence, if believed, had the effect of destroying a substantial part of the defendant's case. An error which prevents proper consideration of the only question relied upon by the defendant is substantial and may not be disregarded. Wamsley v. State, 171 Neb. 197, 106 N. W. 2d 22. Under the circumstances in this case, and particularly in view of the fact that the State's case was based upon circumstantial evidence and is not conclusive we are unable to say that the error was not prejudicial to the defendant.

There are other errors assigned which may not be of sufficient importance, if considered separately, to require that the judgment be reversed. Considered together they present a question as to whether it can be said that the defendant received a fair trial.

The defendant was denied discovery of reports of examination and scientific tests relating to blood and hair

found on the station wagon. The State called two expert witnesses from the Federal Bureau of Investigation Laboratory in Washington, D. C., who testified concerning specimens of blood and hair found on the station wagon. At the close of the State's evidence the defendant requested a continuance in order to confer with experts in the field of blood and hair concerning the evidence which the State had introduced. This motion was overruled.

We have said that the trial court has a broad discretion in ruling upon a discovery motion, but that such a motion should be granted where required by the interests of justice. State v. Reichel, 184 Neb. 194, 165 N. W. 2d 743. We have been slow to reverse where discovery has been denied. See State v. Williams, 183 Neb. 257, 159 N. W. 2d 549.

The scientific evidence in this case was of particular importance because it tended to disprove any theory of accidental death. The Legislature has now provided for discovery in felony cases. Laws 1969, c. 235, p. 867.

A part of the State's case depended upon the doctrine of tacit admission. The State was permitted to prove that on certain occasions the defendant had failed to deny the truth of statements made in his presence. In one instance an employee of the defendant testified to a conversation in which the defendant had said that he had heard the State had a witness who had supposedly seen him at the airport at 1 o'clock and that he supposed the witness thought the defendant had flown in by himself. The witness was then allowed to testify, over objection, that the defendant did not deny that he had done so. At the close of the State's evidence the defendant's motion to strike this testimony was overruled. The evidence was referred to in the closing argument and again a motion to strike was overruled.

In Pierce v. State, 173 Neb. 319, 113 N. W. 2d 333, it was pointed out that the failure to explain or deny is

not admissible unless the circumstances are such that there is occasion to explain or deny.

Several assignments of error relate to misconduct of the special prosecutor. It is the duty of the prosecuting attorney to conduct the trial in a fair and impartial manner and to not inflame the prejudices or excite the passions of the jury against the accused. Garcia v. State, 159 Neb. 571, 68 N. W. 2d 151.

On one occasion, after the trial court had sustained the defendant's objection to a hearsay statement, the special prosecutor said to the witness: "Mr. Mitchell is not going to let us talk about what he told you." On another occasion, after the defendant had objected to a question as leading, the special prosecutor said: "Why don't you want to find out where the glasses were, Mr. Mitchell?" During the rebuttal testimony of the safety patrolman concerning his investigation of "Pete" Booth, as the defendant started to object to a question, the special prosecutor said: "Why don't you want the jury to know this?"

In closing arguments a reference was made to "the continual objections made by Mr. Mitchell." A statement was then made that the State had objected "hardly at all" even though much of the evidence had been technically not admissible. The defendant moved to strike the reference and asked that the jury be cautioned. There was no ruling on the motion to strike but the trial court advised the jury that objections were a technical matter that should not be considered one way or the other.

In closing argument a reference was made to the fact that the defendant did not testify. Section 29-2011, R. R. S. 1943, provides that no reference or comment should be made upon the defendant's failure to testify. Such comment may also be a violation of the federal constitutional rights of the accused. See Griffin v. California, 380 U. S. 609, 85 S. Ct. 1229, 14 L. Ed. 2d 106. We have said that a comment by the prosecuting attorney upon

the failure of the accused to testify is prejudicial unless the evidence of guilt is so conclusive that all will agree that no other factor could have influenced the result. Bruntz v. State, 137 Neb. 565, 290 N. W. 420.

Where any one of several errors assigned is not in itself sufficient to warrant a reversal, if all of them in the aggregate establish that the defendant did not have a fair trial, then it is the duty of the court to award a new trial. Wamsley v. State, *supra;* Pierce v. State, *supra.*

It is unnecessary to discuss the remaining assignments of error. We have considered them and they are without merit, are not prejudicial, or are not likely to occur upon a new trial.

The judgment of the district court is reversed and the cause is remanded for a new trial.

REVERSED AND REMANDED.