Carl Goodwin WILLIAMS, Petitioner,

v.

Charles L. WOLFF, Jr.,* Warden of Nebraska Penal and Correctional Complex, Respondent.

Civ. No. 1483 L.

United States District Court,
D. Nebraska.

Feb. 3, 1972.

---

\* Since the filing of this action, Maurice H. Sigler has been replaced as warden of the Nebraska Penal and Correctional Complex. On the court's own motion the name of the new warden has been substituted as respondent.

Dennis D. Burchard, Lincoln, Neb., for petitioner.

Melvin Kammerlohr, Asst. Atty. Gen., for respondent.

## MEMORANDUM OF DECISION

URBOM, Chief Judge.

The petitioner, Carl Goodwin Williams, is presently incarcerated in the Nebraska Penal and Correctional Complex. He is serving a sentence of life imprisonment imposed by the District Court of Adams County, Nebraska, after a jury found Williams guilty of the crime of first degree murder. The petitioner now has filed in this court a petition for writ of habeas corpus, alleging that his trial was constitutionally defective in that the trial court failed to grant a pretrial motion which sought discovery and inspection of police notes, statements of the defendant, autopsy reports, scientific reports, physical evidence, and all "evidence in the possession of the State of Nebraska favorable to the Defendant, Carl Goodwin Williams, or material evidence relevant to the guilt or punishment of the Defendant, Carl Goodwin Williams." The petitioner further contends that the prosecution failed to disclose to the petitioner the existence of a witness whose testimony would have been exculpatory. The petitioner has moved in this court for summary judgment, filing No. 13. Counsel have presented oral argument, evidence, and briefs.

The petitioner was, at the time of the events which led to his murder conviction, a transient. At intervals he would appear at the residence of Harry Johnson, who lived on a small farm on the east edge of the city of Hastings, Nebraska, just outside the city limits. On several occasions in the past he had stayed at the Johnson residence, exchanging his labor for room and board and occasionally a small wage. He would generally stay for a month or more. He again arrived in early November, 1966. At that time Johnson had no work for Williams but did allow him to stay at the Johnson home. The petitioner did occasional chores at the farm.

The deceased, Mae Ritchie, was an 81–year-old widow who lived alone in a small house approximately 93 feet south of the Johnson residence. At 9:30 a. m. on Saturday, December 10, 1966, the deceased's nephew and guardian, Lloyd Dragoo, arrived at the Ritchie residence to check on his aunt. Upon his arrival he noticed that the door was open and that the interior of the house was quite cool. Mrs. Ritchie slept in a small bedroom located through a set of double doors from the living room. As he approached the bedroom, Dragoo noticed that items of clothing were scattered about the room. He discovered Mrs. Ritchie's body lying on the floor next to her bed. The body was covered by a pile of clothing and other small personal items, apparently the contents of one or more dresser drawers. Dragoo immediately called the sheriff, who arrived on the scene a short time thereafter. An autopsy was performed at 1:30 p. m. on December 10, 1966, by Dr. Ronald A. Moss. The examination and autopsy showed that Mrs. Ritchie had been severely beaten and death was attributed to asphyxiation, caused by obstruction of the airway by bloody mucous.

Criminal investigators from the state highway patrol were called to the scene. An examination of Mrs. Ritchie's home led to the discovery of a tan winter cap beneath one of the pillows on Mrs. Ritchie's bed. The screen and storm cloth over one of the bedroom windows were ripped, and the window was raised 14 to 16 inches. The hook and catch had been ripped loose from the rear screen door, and a smudge of blood was found on the light bulb in the rear porch light. No identifiable fingerprints were found.

On December 8, 1966, at approximately 3:00 p. m., the petitioner was driven to town by Raymond Hock, who also lived at the Johnson residence and worked for Johnson. Sometime after

4:00 p. m., the petitioner approached the Johnson residence from the southwest on foot. He appeared to be intoxicated and disoriented and had a cut on his chin. Williams approached Johnson and said, "I'll get my things and go." Johnson noticed that he was bleeding and asked what happened, and the petitioner said, "somebody hit me; somebody hit me." He indicated that this had happened somewhere to the southwest of the Johnson residence.

The petitioner's cut was cleansed and bandaged by Raymond Hock. Williams then went upstairs to his room. He was seen by Lucy Johnson, Harry Johnson's wife, slumped over in a chair, apparently asleep. Between then and about 9:00 p. m., the petitioner left and returned to his room several times, although he did not leave the Johnson house. At 9:00 p. m. or shortly thereafter he left the Johnson residence, returning at about 11:30 p. m. Upon his return he appeared to be somewhat agitated and was heard to say, "I can't find my cap" and "Where's my cap?", or words to that effect. There was other testimony that Williams did have his cap with him when he left the house at 9:00 p. m. but did not have it with him when he returned at 11:30 p. m.

Williams again left the Johnson house at about 1:30 a. m., Friday, December 9, 1966. He did not return until about noon of the same day. In the meantime he had acquired different clothing, including a different cap, from the Salvation Army in Hastings. He remained at the Johnson house until Monday, December 12, 1966, but was not seen in Hastings after that date. On January 13, 1967, he was arrested in Denver, Colorado, and was returned to Hastings. Defense counsel were appointed on March 3, 1967, and the petitioner was tried on August 7, 8, 9 and 10, 1967.

At trial Dr. Moss testified that the deceased had met death from 36 to 48 hours prior to the time that he performed the autopsy. Thus computed the time of death would have been between 1:30 p. m. on December 8 and 1:30 a. m. of December 9. Merle J. Divis, criminal investigator for the state highway patrol, testified that he found a "tan man's winter cap" under a pillow on the deceased's bed. Sergeant Divis identified a cap, marked as Exhibit 20, as the cap he had found. At that time the prosecution offered the cap in evidence. The defendant's objection as to foundation was sustained. There was other testimony describing the circumstances under which the cap was found, and Sheriff Anderson and Deputy Sheriff Henry testified that the Ritchie residence was constantly under the control of sheriff's officers between the time Anderson arrived on the scene and the time the cap was discovered.

Harry Johnson identified the cap, Exhibit 20, as being similar to the one that Williams had been wearing on Thursday, December 8. Raymond Hock, Harry Johnson's employee, identified Exhibit 20 as the cap belonging to Williams. Exhibit 20 was reoffered into evidence but was again rejected pending further foundation. During Hock's direct testimony the following took place:

"Q. (Interrupting) Did the Defendant leave the Johnson home at that time?

A. Right at 9 o'clock, yes.

Q. Would you describe to the Court and Jury what he was wearing at that time when he left?

A. Well—

Q. (Interrupting) Was he wearing a cap?

A. No.

Q. At the time that he left at 9 o'clock—

MR. DUNMIRE: We object to any further questions on that. He's already answered it.

MR. CONNOLLY: I didn't finish.

Q. (By Mr. Connolly) Do you recall whether or not he was wearing a cap, Mr. Hock, when he left?

MR. DUNMIRE: We object to that as already having been asked and answered.

MR. CONNOLLY: I am refreshing his memory.

THE COURT: He may proceed.

Q. (By Mr. Connolly) Do you recall when he left?

A. Yeah.

Q. Did he have his cap on?

A. Yeah, I believe he did.

Q. I show you what has been marked Exhibit No. 20. Is that the cap that he had on when he left at 9 o'clock?

A. That is right."

Mr. Hock further testified that Williams returned to the Johnson residence at about 11:00 p. m. and at that time he appeared to Hock to be in a highly emotional state. He told Hock, "I have lost my cap."

Lucy Johnson also identified Exhibit 20 as Williams' cap, as did Shirley Hock, Raymond Hock's daughter, who also lived at the Johnson house. Shirley Hock also testified that when she returned to the Johnson house from work at about 11:00 p. m. on December 8 she saw Williams in the Johnson front room or kitchen and he said, "Where's my cap?" or words to that effect. At the conclusion of her testimony Exhibit 20 was received in evidence.

P. M. Stombaugh, a special agent of the Federal Bureau of Investigation, testified that hairs found in Exhibit 20 matched in all characteristics a known sample of hair taken from the head of Williams.

Mrs. Mary Sigman and Lucy Louise Sigman, daughter and granddaughter respectively of Harry Johnson, testified that they were in the company of Williams on the morning of Saturday, December 10, observing the activity around the Ritchie residence from a bathroom window. At that time Williams was heard to say, "Probably someone thought she had a lot of money living here alone, but they probably got 'a foolin.'"

The defense put on no evidence and the case was submitted to the jury.

The jury returned a verdict of guilty on Count II of the information, murder while attempting to perpetrate a burglary, and fixed a sentence of life imprisonment. Williams filed a motion for a new trial on August 14, 1967, alleging as error, among others, that the trial court had erred in denying the defense motion for discovery. An amended motion for a new trial was filed on August 17, alleging that the prosecution had failed to disclose the existence of a witness whose testimony was material to the issue of guilt or punishment of Williams. The amended motion was accompanied by an affidavit executed by Fred Irons, one of the defense attorneys, stating that the defense discovered for the first time on August 12, 1967, the existence of David Morrow, a witness who had been contacted by the prosecution and had been present at the county courthouse on August 8, 9 and 10. The affidavit further stated that Morrow's testimony would have been that he found Williams lying in the grass near the area where the Johnson and Ritchie residences were located, that he struck Williams on the chin, and that he thought Williams' hat was lying on the ground. The prosecution submitted an affidavit executed by David Morrow to the effect that the prosecution had informed him that he was to be a rebuttal witness, that he was at no time told not to talk to Williams' defense attorneys, that he was at all times available as a witness, and that he at no time saw a cap.

On September 8, 1967, the defense motion for a new trial was overruled by the trial court and appeal was taken to the Supreme Court of Nebraska. The conviction and sentence were affirmed on appeal, the court holding that the trial court is vested with broad discretion on matters of pretrial criminal discovery and that such discretion had not been abused. State v. Williams, 183 Neb. 257, 262, 159 N.W.2d 549 (1968). As to the question of the failure of the prosecution to disclose the identity of the witness Morrow, the court said, "We

do not feel that this record supports defendant's contention that the county attorney *willfully* suppressed any evidence." (Emphasis added) 183 Neb. at 265, 159 N.W.2d at 554.

Justices Smith and McCown concurred in the judgment of affirmance, but felt that the rules regarding discovery and inspection should be prospectively revised, as prior state supreme court decisions had given the trial court *"carte blanche* to refuse inspection." 183 Neb. at 265, 159 N.W.2d 549.

The questions of the refusal of the trial court to grant the defense discovery motion and the failure of the prosecution to call to the attention of the defense the existence of the witness Morrow are the issues presented to this court as grounds for relief through habeas corpus. As these issues were presented to the state supreme court on direct appeal, I am satisfied that the petitioner has exhausted available state remedies.

Counsel for the petitioner correctly points out that, as to the discovery issues, the question is not whether the petitioner had a constitutional right to discover the state's evidence, but whether the refusal to allow inspection and discovery deprived the petitioner of his right to a fair trial.

Three specific items are referred to by the petitioner as having, by defense counsel's inability to examine them prior to trial, caused the petitioner's right to a fair trial to be abridged. These are the autopsy report, the cap, and the various Federal Bureau of Investigation scientific reports.

### a. The autopsy report

Dr. Moss was the pathologist who performed the postmortem examination of Mae Ritchie. A written report of the examination, dated December 27, 1966, was submitted to the county attorney. The final paragraph of the written report said:

"The rather marked autolytic changes which have occurred in many of the tissues including the heart as well as the liver, spleen, kidneys, and other organs suggest that death may have occurred at a considerable time prior to the autopsy. It would be difficult from examination of the sections to estimate exactly when death occurred. However, it seems highly unlikely that it could have been less than 12 hours prior to the autopsy and was more likely 24 to 36 hours."

If the time of death had been no more than 36 hours prior to the time of the autopsy, it could have been no earlier than 1:30 a. m., Friday, December 9. However, at the trial Dr. Moss revised his estimate of the time of death to include the period of 36 to 48 hours prior to the autopsy, or no earlier than 1:30 p. m., Thursday, December 8. It is the petitioner's contention that failure to allow the defense to examine the autopsy report prior to trial severely limited the ability of the defense to cross-examine Dr. Moss on the matter of the inconsistency of his written report and his testimony. The record reveals, however, that the discrepancy between the written report and the doctor's testimony was pointed out by the prosecution:

"Q. Doctor, in your initial findings, did you not have an opinion as to the time of death that didn't correspond with the opinion that you just gave at this time?

A. Yes.

Q. And what was that opinion?

A. The time at the time I made my original report or submitted my original report to the County Attorney's office, I stated if I recall that I did not think death could have occurred less than twelve hours preceeding [sic] the time of examination, and I said a more probable figure was twenty four to thirty six.

Q. Did you make further examination, then, to alter your opinion?

A. Yes.

Q. What was this examination, will you tell the Court and Jury?

A. Well, a more careful examination principally by microscopic means of the section we had and the tissue

which was saved was made and after the examination and taking into account the rather severe degree of autolytic changes which had occurred.

Q. What do you mean by autolytic changes?

A. Well, decompsition [sic] resulting from enzymatic action in the tissue. This is a self destruction of the tissue literally, or self dissolving, is what the word actually means in this sense. Taking these all into account together with some information about the temperature of the room, the time of the year, the presence of the bacteria, I also didn't mention in my original statement that the brain was examined and there were some fairly extensive autolytic changes within the brain. Taking all these into account I think the figure of twelve hours was much too low. I don't think the figure of twenty four hours is very probable. I think the figure of thirty six is most reasonable mimimum time.

Q. And the maximum time again?

A. Was forty eight hours."

■ The defense's cross-examination of Dr. Moss as to the discrepancy between his testimony and his written report occupies nearly five pages of the record. The record does not clearly reveal whether defense counsel had a copy of the autopsy report at the time of the trial, although there is indication that they did have. Defense counsel on cross-examination of Dr. Moss refers to the date of the report, December 27th, although no reference was made to the date on direct examination. Defense counsel also during cross-examination asked about the conclusions "in here", which in context gives the impression that he is referring to a report he then possessed. Under the circumstances, no prejudice resulted from the refusal to allow the defense to inspect the autopsy report prior to trial. Cf. Peoples v. Hocker, 423 F.2d 960, 963 (C.A. 9th Cir. 1970).

b. The physical evidence

The most damaging piece of physical evidence against the petitioner was the cap found in Mae Ritchie's room. The petitioner contends that had the defense been allowed to examine the cap, it would have been able to point out such facts as that the cap was of a common type and perhaps establish that there were a large number of caps of the same or similar type in the Hastings area. As with the autopsy report, I conclude that no prejudice amounting to a denial of a fair trial resulted from the inability of the defense to inspect the cap.

■ The cap was marked as Exhibit 20 in the trial court and was first produced by the prosecution during the direct examination of Merle Divis on the first day of trial. It was not received in evidence at that time. From that time it was available for inspection by the defense. It was not received into evidence until at least one full trial day later. It is entirely possible that defense counsel chose to limit their references to the cap in order to attempt to minimize its impact. If so, it was a matter of trial strategy and should not be reviewed by this court on the basis of speculative assumptions as to what defense counsel might have done had they been able to inspect the cap earlier.

It is apparent that the defense knew of the existence of the cap in advance of trial. During the cross-examination of Adams County Sheriff Robert Anderson the following exchange took place:

"Q. Did anyone else have the cap in their possession other than you, other than the F. B. I. and the Sheriff and the Deputy Sheriff?

A. No, Sir.

Q. Did any commercial photographer or any magazine reporters have it in their possession or see it or take pictures of it?

A. They seen [sic] it, yes, Sir.

Q. And they took pictures?

A. But it was in my possession.

Q. They took pictures of it?

A. No, Sir. I will take that back. These pictures were pictures we had taken of it.

Q. You gave them some pictures that you had taken of it, is that correct?
A. Yes, Sir.

\* \* \* \* \* \*

Q. . . . There was a picture of this cap, some cap, in some detective magazine article, is that correct?"

Particularly in view of the fact that no reference was made previous to this exchange to any magazine reporters or photographers or photographs in a magazine, the implication of the questions is that the defense counsel knew of the existence of the cap and the pictures of it. Whether defense counsel ever saw those pictures is not shown by the record. From this I conclude that refusal to allow the defense to inspect the cap, even if error, was harmless within the meaning of Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

This is not to intimate in any way that knowing of an article in a detective magazine is or could ever be an adequate substitute for an opportunity for the defense to inspect material evidence. A practice of disclosing evidence to a writer for a detective magazine while denying access to the defendant's attorneys is at best highly questionable. It seems an odd bit of professional conduct on the part of one charged with enforcing the law. But the question before the court is whether the inability to inspect served to deprive the petitioner of a fair trial, and I must conclude that it did not.

### c. The F.B.I. reports

Numerous samples and items of evidence were submitted to the Federal Bureau of Investigation for analysis. Five written reports were returned to the prosecution. As with all the other items of evidence, the defense attorneys were denied an opportunity to inspect the reports. The reports were not introduced at trial, but two experts from the Federal Bureau of Investigation did testify as a part of the prosecution's case. Allison Semms, an F.B.I. expert on body fluid analysis identified the stains on Exhibit 20 as being human blood, but was unable to type or otherwise identify the stains. The other expert, Paul Stombaugh, testified that three hairs found in the lining of Exhibit 20 matched known hair samples taken from Williams in all identifiable characteristics. Semms was asked only one question on cross-examination; Stombaugh was asked none.

The petitioner points out that the F.B.I. report of May 24, 1967, which states that the hair samples taken from the Q5 hat (Exhibit 20) orginated from Williams or from another Caucasian whose head hairs exhibited the same microscopic characteristics, also contained the following caveat:

"It is pointed out that hairs do not possess enough individual microscopic characteristics to be positively identified as originating from a particular person to the exclusion of all others."

The petitioner further points out that two hair samples were submitted, one from the deceased's nephew, Lloyd Dragoo, and the other from Williams. Both were designated in separate F.B.I. reports as sample K7. The petitioner contends that had the defense been armed with this knowledge, it could have effectively cross-examined Stombaugh.

Stombaugh was not cross-examined. On direct examination he said that the hair found in Exhibit 20 "originated either from the head of Mr. Williams, or from another member of the Caucasian race whose head hairs are identical . . . ." This would seem to suggest the possibility that other individuals could have head hairs with identical characteristics, and defense counsel was free to explore that possibility on cross-examination.

The designation of two different hair samples by the symbol "K7" would seem to suggest the possibility that there could have been confusion as to the source of the samples. An examination of the reports indicates that this is an extremely remote possibility. The earliest F.B.I. report is dated January 13, 1967. This contains the report on hair samples found in Q5 and a hair sample

designated as "K7 Head hair from LLOYD DRAGOO." The report states: "Two medium brown head hair fragments of Caucasian origin and a single white head hair fragment of Caucasian origin were found in Q5. These hair fragments are dissimilar to the K7 hairs of DRAGOO and it is doubtful that they originated from him."

A head hair sample was taken from Williams when he was given a haircut on March 6, 1967. It was placed in a sealed envelope and submitted to the F.B.I., along with debris from the deceased's room. These were the subject of a report dated April 28, 1967, and the Williams sample was designated "K7 Head hair sample from Carl G. Williams." These samples were mounted on a slide marked and initialed by Stombaugh. No hairs like the Williams sample were found among the debris. The K7 slide and the slide containing the sample found in Q5 were resubmitted and were the subject of a May 24, 1967, report which matched the two and contained the caveat noted above. In view of this, it is extremely unlikely that confusion could have occurred.

It should also be noted that defense counsel did not renew his request for the F.B.I. reports during the course of the testimony of the F.B.I. experts. It is entirely possible that the trial court would have granted a defense request to inspect the documents at that time. I cannot infer from the trial court's denial of the defense discovery motion that the defense was thereby precluded from requesting inspection at an appropriate time during the course of the trial, nor would anything in the record support such a conclusion.

■ I have examined the written reports prepared by the F.B.I. I can find nothing in them that would tend to exculpate Williams, nor is there anything that would impeach any of the testimony of the prosecution's witnesses. The prosecution was therefore under no duty to disclose any of the material to the defense under the holdings in Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) or Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

I believe that an opportunity to inspect the materials discussed above may have been helpful to the defense in preparing a case. I further believe that granting the defense request for discovery would not have compromised the state's ability to present its case. However, the record does not support the petitioner's contention that denial of the pretrial discovery motion rendered the proceedings so unfair as to amount to a denial of the petitioner's right to due process of law. Reichel v. Sigler, Civ. 1558 L (unreported memorandum, U.S. D.C.Neb. June 12, 1970); Riley v. Sigler, 437 F.2d 258 (C.A. 8th Cir. 1971).

Commendably, the law regarding pretrial discovery in criminal trials has been considerably altered in Nebraska with the adoption of §§ 29–1912 through 29–1924 R.R.S.Neb. (1969 Cum.Supp.). See State v. Davis, 185 Neb. 433, 176 N.W.2d 657 (1970); Comment, "Nebraska Criminal Discovery," 50 Neb.L. Rev. 85 (1971).

d. Failure to disclose the existence of witness Morrow

The second issue raised by the petitioner, that the prosecution failed to advise the defense of the existence of the witness David Morrow, is a troubling one.

It is clear that under some circumstances the failure of the prosecution to disclose evidence to the defense, whether intentional or inadvertent, may amount to constitutional error. The general rule is stated in Brady v. Maryland, supra:

"We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196.

Prior to the decision in *Brady*, the rule had been essentially that some form

of prosecutorial misconduct was a prerequisite to a finding of constitutional error, i. e., the prosecution's knowing use of perjured testimony, Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935), or that the evidence was suppressed by the prosecution in an effort to deceive the court, Alcorta v. Texas, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed. 2d 9 (1957). In developing from that posture the lower courts have emphasized the harm to the defendant rather than the motive of the prosecutor in failing to disclose material evidence. Barbee v. Warden, Maryland Penitentiary, 331 F.2d 842 (C.A. 4th Cir. 1964); United States ex rel. Meers v. Wilkins, 326 F.2d 135 (C.A.2nd Cir. 1964); Note, "The Duty of the Prosecutor to Disclose Exculpatory Evidence," 74 Yale L.J. 136 (1964).

▆▆ I think, however, that a distinction must be drawn between withheld material evidence that is *exculpatory* and that evidence which may be of assistance to the defense in the preparation of its case. In the case of the former the prosecution has a duty to disclose. Giles v. Maryland, 386 U.S. 66, 87 ·S.Ct. 793, 17 L.Ed.2d 737 (1967); Ashley v. State of Texas, 319 F.2d 80 (C.A. 5th Cir. 1963), cert. denied, 375 U.S. 931, 84 S.Ct. 331, 11 L.Ed.2d 263 (1963); cf. Scalf v. Bennett, 408 F.2d 325 (C.A. 8th Cir. 1969). As to the latter, it appears that no such constitutional rule obtains. In Griffin v. United States, 87 U.S.App.D.C. 172, 183 F.2d 990 (1950), the court at least intimates that those things that might be useful to the defense should be disclosed:

"... When there is substantial room for doubt, the prosecution is not to decide for the court what is admissible or for the defense what is useful. ..." 183 F.2d at 993.

However, the question there was related more to whether certain evidence was admissible. The prosecution had failed to disclose evidence of an uncommunicated threat, on the prosecutor's belief that it was inadmissible. When the defense learned of the uncommunicated threat, a motion for a new trial was filed on the basis of newly discovered evidence. A denial of the motion was affirmed on appeal. Griffin v. United States, 83 U.S.App.D.C. 20, 164 F.2d 903 (1947). The Supreme Court reversed, holding that the Court of Appeals should first determine whether the evidence would be admissible. Griffin v. United States, 336 U.S. 704, 69 S.Ct. 814, 93 L.Ed. 993 (1949). On remand the Court of Appeals held that the evidence would be admissible, determined that Griffin was entitled to a new trial, and declined to specculate as to the significance the jury would attach to the evidence. Griffin v. United States, 87 U.S.App.D.C. 172, 183 F.2d 990, 992 (1950). As I view it, that case did not fashion a constitutional rule that the prosecution must disclose evidence which would merely aid the defense in the preparation of its case. I believe that the parameters of the constitutional rule are broad enough to encompass the failure to disclose evidence which is exculpatory or which tends to impeach prosecution witnesses, but not so broad as to include that evidence which would be merely helpful in preparing a defense. The testimony which could have been given by David Morrow could not have had the effect of tending to exculpate the petitioner or to impeach prosecution witnesses.

The petitioner points to statements made in the prosecution's closing argument which would tend to indicate that the prosecution believed the murder of Mrs. Ritchie occurred during the period between the time Williams left the Johnson residence at 3:00 p. m. Thursday and returned at about 5:00 p. m.[1] It is clear

---

1. The pertinent portion of the closing argument is as follows:
"The evidence shows that on the 8th of December, 1966, the Defendant, at approximately between 4:00 and 5:00 P.M. came from a west direction. Mr. Johnson observed the cut on his chin, and he was bleeding at the time. The Defendant mumbled, 'I'll get my things and go.' Mr. Johnson sent him up to

**640**

that if the jury believed that, the testimony of David Morrow would have been material, and would have been exculpatory, in that it would have been inconsistent with the state's theory of Williams' guilt. But from the entire record it is clear beyond a reasonable doubt that the jury could not have been misled as to the time of Mrs. Ritchie's death. The major premise of the state's case was that Exhibit 20 was in Williams' possession at 9:00 p. m. Thursday. Had the jury thought that the murder occurred in the afternoon, prior to 9:00 p. m., they could not have believed that Williams lost his cap at the time the murder was committed. The testimony of Morrow, even if it would have been as defense counsel contended in Irons' affidavit, would not have been exculpatory. It would not have been inconsistent with a theory of Williams' guilt, and it would have neither impeached nor affected the credibility of any state's witnesses. Furthermore, the record disputes any probability that Morrow would have testified that he saw a cap when he was with Williams during the afternoon of Thursday. Irons' affidavit as to what Morrow would have said would be inadmissible. Becker v. Koza, 53 F.R.D. 416 (U.S.D.C.Neb. 1971). In view of the Morrow affidavit which contradicts the Irons affidavit as to what Morrow would have said, it would appear that there is no issue of fact as to the substance of Morrow's testimony. In sum, the affidavit of Morrow would be acceptable evidence as to the probable testimony he would have given at trial. The affidavit of Irons would not. Thus, from the evidence properly before the court it could only be concluded that Morrow's testimony would have in no way been of value to the defense. I hold that the prosecutor had no constitutional duty to disclose to the defense that Morrow was a potential witness.

the house to have his wound taken care of and at the house, he did have his wound taken care of. His friend, Mr. Ray Hock, put a bandage around his chin. Sometime in that intervening

From a review of the record as a whole, I conclude that the petitioner is entitled to no relief. An appropriate order will be entered this day.

time, if you will picture a storm screen being slashed, the window being opened, and the drunken defendant falling in upon his unsuspecting, unhearing victim; . . ."