Carl Goodwin WILLIAMS, Appellant,

v.

Charles L. WOLFF, Jr., Successor to Maurice H. Sigler, Warden of Nebraska Penal and Correctional Complex, Appellee.

No. 72–1126.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 13, 1972.

Decided Feb 13, 1973.

Dennis D. Burchard, Lincoln, Neb., for appellant.

Clarence A. H. Meyer, Atty. Gen., and Melvin K. Kammerlohr, Asst. Atty. Gen., Lincoln, Neb., for appellee.

Before BRIGHT and STEPHENSON, Circuit Judges, and TALBOT SMITH, District Judge.[*]

PER CURIAM.

Carl Goodwin Williams, the appellant, was found guilty of the crime of first degree murder, after a jury trial in 1966, and was sentenced to life imprisonment. In June of 1968 the Supreme Court of Nebraska affirmed the conviction. State v. Williams, 183 Neb. 257, 159 N.W.2d 549 (1968). On February 22, 1969, Williams petitioned the United States District Court for the District of Nebraska for a writ of habeas corpus, moving for summary judgment therein on October 12, 1971, the motion being "based upon the pleadings and stipulation submitted to the Court by the parties, including records of State Court proceedings, Federal Bureau of Investigation reports, an autopsy report and a State Court evidentiary exhibit." Counsel presented to the District Court oral argument, evidence, and briefs, following which, following a thorough examination, the petition was denied, 339 F. Supp. 631, and Williams appeals. We affirm.

The basic facts disclosed by the record are these: Williams was a transient who lived, at times, in the residence of Harry Johnson who had a farm near Hastings, Nebraska. He showed up there again in November of 1966 and was again allowed to stay in the home, doing occasional chores on the farm.

Near the Johnson residence lived the deceased, Mae Ritchie, an 81-year-old widow. She lived alone. Her nephew and guardian, Lloyd Dragoo, found her body on Saturday, December 10, 1966. Her body, showing evidence of a severe beating, was found on the floor of her bedroom. It was covered by clothing and other small personal items, apparently from the dresser drawers.

Authorities called to the scene discovered a tan winter cap under one of the pillows on her bed. (Much of the appeal turns on this cap and its hair contents.) No identifiable fingerprints were found. The screen and storm cloth over one of the bedroom windows had been ripped and the window raised.

We now turn to Williams' whereabouts and actions. On December 8 he had been driven to town by Raymond Hock, who also lived with the Johnsons. Later in the afternoon (around 4:00 p. m.) Williams returned to the Johnson residence. He was walking, appeared intoxicated, and had suffered a cut on his chin. Questioned by Johnson as to his injury, he replied "Somebody hit me, somebody hit me." Hock then bandaged the cut for him and Williams went upstairs to his room where he was later seen apparently sleeping in a chair. Again he left the home, about nine, returning about 11:30. At this time he seemed agitated and complained of a missing cap. "I can't find my cap," he was heard to say, and "where's my cap?" It was testified, as to this, that when he left the house at 9:00 p. m., he had his cap, but not when he returned at 11:30.

From the Salvation Army in Hastings he received another cap, as well as other clothing, the next morning, December 9. He remained at the Johnson house that day. The following day, December 10, Williams observed in the presence of Johnson's daughter and granddaughter, as they observed the activities around the Ritchie house "Probably somebody thought she had a lot of money living there alone, but they probably got 'a

* Eastern District of Michigan, sitting by designation.

foolin.' ". At this time, as the Supreme Court of Nebraska noted, no one in the Johnson residence was aware of the murder. Williams left the Johnson residence on Monday morning, without his suitcase, and was not seen in Hastings thereafter. He was arrested in Denver on January 13, 1967, and returned to Hastings. Counsel was appointed in March and trial held in August.

The constitutional defects asserted by Williams relate to the trial court's denial of his discovery motion, as well as the prosecution's failure to disclose the existence of a witness and scientific test, both of which are alleged to be exculpatory.

■ The discovery motion submitted prior to trial sought the production of the notes of arresting officers, police reports, statements or admissions made by defendant, witnesses, and third parties, autopsy reports, chemical analyses, blood tests, fingerprint tests, physical evidence, photographs and "Any and all other evidence in the possession of the State of Nebraska favorable to the defendant, Carl Goodwin Williams, or material evidence relevant to the guilt or punishment of the defendant, Carl Goodwin Williams." This motion was denied by the Court under its broad discretionary powers. State v. Williams, *supra*. It was obviously too broad and sweeping. United States v. Cobb, 271 F.Supp. 159 (S.D.N.Y.1967). No affidavit was submitted in support thereof. But the petitioner, while conceding there was no constitutional right to the discovery demanded, asserts that the denial thereof, specifically with respect to the autopsy reports, the cap, and the F.B.I. reports, amounted to a denial of due process.[1]

■ The autopsy report of the pathologist dated December 27, 1966, stated that "it would be difficult from exami-nation of the sections to estimate exactly when death occurred. However, it seems highly unlikely that it could have been less than 12 hours prior to the autopsy and was more likely 24 to 36 hours." At the trial the Doctor stated that "a more careful examination by microscopic means" caused him to set the maximum time as 48 hours. The appellant urges that had he had discovery of the original autopsy report he could have more effectively cross-examined the pathologist as to the extension of the maximum time from an estimated 36 hours to 48. In view of the fact, however, that the different time estimate was pointed out by the prosecution at the trial, that the report was available at the trial,[2] and that extensive cross-examination was had thereon, we find no constitutional invasion. Actually, what appellant really contends here (and this is true as well with respect to the cap, and the F.B.I. reports) is that his "position was not presented as well in the trial court as it could have been" had he had the discovery he sought. This is an argument of relative merits. Appellant may well be correct in his assertion, but that he might have had a better trial with the discovery he sought does not mean that, upon the record before us, the trial he had was unconstitutionally defective.

■ Appellant next attacks the failure of discovery as to the cap found in the bed of the deceased. This cap, after lengthy foundation, was introduced into evidence on the first day of the trial. Appellant argues that he might have cross-examined more effectively as to the cap had it been produced when discovery was prayed. From the first day of the trial, however, it was clearly available to the defense. Moreover, it is a fair implication from the record that the existence of the cap and pictures of

---

1. The Nebraska law respecting discovery in criminal cases has been liberalized since the trial here examined. See 50 Neb. L. R. 85 (1970). cf. Rule 16, F.R.Crim.P.

2. We agree with the District Court's conclusion on the record that defense counsel had a copy of the autopsy report at the time of the trial.

it were known to the defendant prior to trial.[3] Against this background in the record we cannot hold that the denial of discovery as to the cap deprived appellant of a fair trial.

With respect to the F.B.I. analyses, the appellant complains of confusion, error, and suppression, which, he asserts, he could more effectively have exposed to the jury had his discovery motion been granted.

The symbol K–7 was used twice by the F.B.I. The first use was to denote a hair sample taken from Lloyd Dragoo. The F.B.I. report of January 13, 1967, contains a report on hair samples found in the cap (designated Q5) and also a hair sample designated as "K7 Head hair from Lloyd Dragoo." The report contains, *inter alia,* the following:

> Two medium brown head hair fragments of Caucasian origin and a single white head hair fragment of Caucasian origin were found in Q5. These hair fragments are dissimilar to the K7 hairs of DRAGOO and it is doubtful that they originated from him.

However, no hair samples were taken from appellant until March 6, 1967, when such were placed in a sealed envelope and sent to the F.B.I., along with debris from the room of the deceased. The F.B.I. reported on these under date of April 28, 1967, the Williams sample being designated as "K7 Head hair sample from Carl G. Williams." None of the hair in the debris matched the Williams sample. This K7 slide and the

slide containing the hair from the cap were then resubmitted to the F.B.I. and were reported upon under date of May 24, 1967. This report also stated as a caveat that:

> It is pointed out that hairs do not possess enough individual microscopic characteristics to be positively identified as originating from a particular person to the exclusion of all others.

The F.B.I. expert, Paul Stombaugh, testified. He stated that the hair found in Exhibit 20 (the Q5 hat) "originated either from the head of Mr. Williams, or from another member of the Caucasian race whose head hairs are identical and all have the comparison with the microscopic examination of the hairs in this case." There was no cross-examination.

■■ Upon the record so made it is highly unlikely that there was any confusion between the hair of Lloyd Dragoo and that of the appellant. Not only were there appreciable chronological differences in the submissions, and the circumstances thereof, but the reports themselves, and the testimony, preclude any but the remotest chance of error. Nor do we find any constitutional infirmity resulting from the non-disclosure of the caveat quoted above, in view of the fact that Stombaugh's testimony clearly suggested the possibility that other human beings might have head hair with identical characteristics. This left counsel free to explore the topic in relevant detail.

On the entire topic of possible exculpation of Williams by materials in the

---

3. The cross-examination of the Sheriff, Robert G. Anderson, reveals the following.
"Q. Did anyone else have the cap in their possession other than you, other than the F.B.I. and the Sheriff and the Deputy Sheriff?
A. No, Sir.
Q. Did any commercial photographer or any magazine reporters have it in their possession or see it or take pictures of it?
A. They seen it, yes, Sir.
Q. And they took pictures?

A. But it was in my possession.
Q. They took pictures of it?
A. No, Sir, I will take that back. These pictures were pictures we had taken of it.
Q. You gave them some pictures that you had taken of it, is that correct?
A. Yes, Sir.
* * *
Q. . . . There was a picture of this cap, some cap, in some detective magazine article, is that correct?" (T. 165–167)

F.B.I. reports, we have found, upon examination, nothing to suggest the application of Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

The final claim of error by appellant relates to a possible witness, characterized as a rebuttal witness by the state, whose existence and relation to the case, known to the state, had not been disclosed to the defense. His name was David Morrow.

We have noted that Williams returned to the Johnson home about four o'clock in the afternoon of December 8. At that time he appeared to be intoxicated and had suffered a cut ·on his chin. Subsequent to the trial the defense attorneys, learned the name of Mr. Morrow, who had fought with the appellant on the afternoon of December 8, and who had inflicted the cut on his chin. The significance of his possible testimony principally concerns the appellant's

cap, found, it will be recalled, on the bed of the deceased. Mr. Morrow's affidavit [4] states that at no time did he see the cap.

The appellant urges that from portions of the prosecutor's closing argument [5] he sought to fix the time of the murder as between three and five p. m., on the eighth. If this were the state's theory, then the testimony of Morrow would have had significance, since it could have been argued that he had lost his cap in the fight, and hence could not have been wearing it when he left the house at nine, and that someone else had found it and placed it in the bed "to draw suspicion away from himself," as appellant puts it.

■■■ The difficulty with all of this is that it is abundantly clear on the record that the entire thrust of the State's case was that Williams wore the cap when he left the house about nine in the evening,[6] that he did not have it

---

4. The affidavit of Mr. Irons, one of the defense attorneys, was to the effect that Morrow had told him that he, Morrow, did not think that Williams had a cap on when he was struck, but thought the cap was lying on the ground, and that he left the scene while Williams was still lying on the ground. As to admissibility hereof, see Becker v. Koza, 53 F.R.D. 416 (U.S.D.C.Neb.1971).

5. "The evidence shows that on the 8th of December, 1966, the Defendant, at approximately between 4:00 and 5:00 p.m. came from a west direction. Mr. Johnson observed the cut on his chin, and he was bleeding at the time. The Defendant mumbled, 'I'll get my things and go.' Mr. Johnson sent him up to the house to have his wound taken care of and at the house, he did have his wound taken care of. His friend, Mr. Ray Hock, put a bandage around his chin. Sometime in that intervening time, if you will picture a storm screen being slashed, the window being opened, and the drunken Defendant falling in upon his unsuspecting, unhearing victim ; . . . "

6. "Q. What did the Defendant do, Mr. Hock, after you put this bandage on his chin?

"A. Well, he kind of sit there on a chair for awhile, and he got up and he did manage to 'mumble' into the other room.
"Q. Did he go upstairs at that time?
"A. Yes, he did.
"Q. Did he come down later?
"A. He sure did.
"Q. Where were you at this time?
"A. I was a sitting in a chair watching television.
"Q. About what time was that?
"A. Oh, approximately about—around a little bit at close about 9:00.
"Q. What was his condition at that time?
"A. Well, it was just practically the same.
"Q. Still mumbling?
"A. That's right.
"Q. What happened then, if anything, Mr. Hock?
"A. Well—
"Q. (Interrupting) Did the Defendant leave the Johnson home at that time?
"A. Right at 9 o'clock, yes.
"Q. Would you describe to the Court and Jury what he was wearing at that time when he left?
"A. Well—
"Q. (Interrupting) Was he wearing a cap?

when he returned, emotionally upset, about eleven, and that it was found, containing samples of his hair, or of someone whose hair was identical with his, in the bed of the deceased. Under this theory Morrow's testimony (either his own version, or his attorney's) would not have been exculpatory, it would not have been inconsistent with Williams' guilt, and it would not have impeached any State's witness. The prosecutor was under no constitutional duty, upon the record of this case, to inform the defense of the possibility of Morrow's testimony. In so holding we follow the teachings of Brady v. Maryland, *supra*, but without the suggested expansion that the constitutional duty there enunciated encompass as well any evidence which might conceivably aid the defense in the preparation of its case. The problem with the expansion of the duty is a practical one. There is little in the prosecutor's file which might not "aid" in some remote or fanciful way the defense of a case. Unless we are prepared to hold that the prosecutor's file shall be opened to the defense upon demand, which may, indeed, be in the wind, we are not prepared to bring the suggested expansion within the constitutional duty.

We are constrained to observe, as well, that upon a careful review of the entire record we are left with an overwhelming conviction that the evidence points to appellant as the perpetrator of the crime.

Affirmed.

"Q. At the time that he left at 9 o'clock—

"MR. DUNMIRE: We object to any further questions on that. He's already answered t.

"MR. CONNOLLY: I didn't finish.

"Q. (By Mr. Connolly) Do you recall whether or not he was wearing a cap, Mr. Hock, when he left?

"MR. DUNMIRE: We object to that as already having been asked and answered.

"MR. CONNOLLY: I am refreshing his memory.

"THE COURT: He may proceed.

"Q. (By Mr. Connolly) Do you recall when he left?

"Q. Did he have his cap on?

"A. Yeah, I believe he did.

"Q. I show you what has been marked Exhibit No. 20. Is that the cap that he had on when he left at 9 o'clock?

"A. That is right." (238:23; 239:1-25; 240:1-22)