In *re* RAYMOND SMITH, a Minor.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* RAYMOND SMITH, Respondent-Appellant.)

First District (4th Division)   No. 62233

Opinion filed May 26, 1976.—Rehearing denied July 14, 1976.

James J. Doherty, Public Defender, of Chicago (Gary G. Stanton and Judith A. Stewart, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Kevin Sweeney, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE BURMAN delivered the opinion of the court:

The instant appeal stems from a delinquency petition filed by the State which alleged that the respondent, Raymond Smith, was delinquent in that he committed the offense of robbery in violation of section 18—1 of the Criminal Code. (Ill. Rev. Stat. 1973, ch. 38, par. 18—1.) At the conclusion of the adjudicatory hearing, the respondent was found to be delinquent and thereafter was committed to the Department of Corrections. In seeking to reverse the juvenile court's adjudication and his commitment, the respondent contends on review that (1) he was not proven delinquent beyond a reasonable doubt; (2) the juvenile court abused its discretion when it committed him to the Department of Corrections without seriously considering the alternate plan suggested by his uncle; and (3) the court did not have jurisdiction to enter a dispositional order because he was never adjudged a ward of the court pursuant to the dictates of section 4—8 of the Juvenile Court Act (Ill. Rev. Stat. 1973, ch. 37, par. 704—8(2)).

A review of the record reveals that on September 10, 1974, approximately at 9:30 a.m., Carl and Ellory Lockhart, Maurice Johnson, and Alex Harris were walking to their high school when the respondent came up behind them and stated "walk slow." After these individuals had walked a block, the respondent ordered the four boys to enter a hallway of an apartment building. Once inside this hallway, the respondent, who was observed carrying a gun in his pants by Carl and Ellory Lockhart, directed each person to empty his pockets. He thereupon proceeded to take (1) $2 from Carl Lockhart as well as the latter's Timex watch which had a white face, lines instead of numbers, and a couple of diamond-like "crystals" on it, (2) $0.80 from Ellory Lockhart, (3) another watch from Maurice Johnson and (4) $3 from Alex Harris.

Subsequent to the respondent procuring the above mentioned items, he left the scene of the altercation. Although he told his victims, prior to his departure, to remain where they were, Carl Lockhart followed the respondent for a block while his brother went home and informed his mother of the incident. Thereafter, the police were notified about what had transpired not only by Mrs. Lockhart, but also by Carl who informed the Chicago police officer at his high school after he stopped following the respondent.

On September 13, 1974, Officer John Desimone, who had already conversed with Carl and Ellory Lockhart on the prior day and had obtained a description of Carl's watch, picked up the Lockhart brothers and Maurice Johnson and commenced touring the area where the

incident took place. As they proceeded around the area for 30 minutes, the victims observed and identified the respondent walking down the street. Officer Desimone then stopped the respondent, placed him under arrest, and advised him of his constitutional rights. Moreover, as the respondent was being placed under arrest, Carl Lockhart noticed that he (the respondent) had his watch on his arm. Officer Desimone took this watch, which parenthetically matched the description of the watch procured from Carl Lockhart, and brought it to the police station where it was inventoried and placed in the evidence section.

On September 14, 1974, a petition for an adjudication of wardship was filed seeking to declare the respondent a ward of the court on the basis that he committed four counts of robbery[1] in violation of section 18—1 of the Criminal Code. (Ill. Rev. Stat. 1973, ch. 38, par. 18—1.) At a detention hearing conducted on the same date, the public defender requested a probable cause hearing. This hearing was continued to September 16, 1974, at which time, the trial court found that based solely on Officer Desimone's testimony as to what transpired on September 10, 1974, through September 13, 1974, there was probable cause to detain the respondent on the first three counts. An order was then entered placing the respondent in temporary custody of the superintendent of the Arthur Audy detention home pending the disposition of his wardship hearing.

After the trial court granted a continuance on September 26, 1974, the adjudicatory proceedings commenced on October 3, 1974, wherein the State initially called Carl Lockhart to retrace the events that occurred on September 10, 1974. This testimony was substantially corroborated by Ellory Lockhart who also indicated that he had seen the respondent prior to the instant altercation. The State then called Officer Desimone who reiterated his involvement in the case at bar. Subsequent to Carl Lockhart being recalled to identify his watch which was introduced into evidence, the State rested. Thereafter, the defense presented its case-in-chief in which a factual scenario, divergent from the one derived from the testimony of the State's witnesses, was given.

The respondent took the stand in his own behalf and disclaimed any involvement in the instant robbery. He testified that on the night prior to the incident, he, along with other members of a band, were auditioning at a lounge until 11:30 p.m. The band then went to a member's home where

---

[1] The petition for adjudication of wardship alleged that the respondent committed robbery in that through the use of force, he took the following items from the respective individuals:

Count I—A watch and two dollars from Carl Lockhart.
Count II—Eighty cents from Ellory Lockhart.
Count III—A watch from Maurice Johnson.
Count IV—Three dollars from Alex Harris.

they spent the night. The respondent expounded that he went to bed at 1:30 a.m., did not get up until noon on the day of the robbery and did not depart his friend's home until 4 p.m.

The respondent further testified that on August 29, 1974, he won two watches, a ring and $64 while gambling. With regard to the watches, he respectively described them as black Longine and a Timex with a silver band and a white face containing little lines instead of numbers. Besides stating that the Timex watch, which he had won, was the same watch that had previously been admitted into evidence, the respondent related that at a rehearsal conducted on August 30, 1974, he offered both watches to two members of the band, namely, Curtis McCullen and Kevin Edwards. He indicated that the latter individual agreed to purchase the Timex watch after the group performed at a lounge, but the transaction was never consummated. Instead, the respondent kept the watch and was wearing it when he was arrested on September 13, 1974.

In addition to testifying as to his whereabouts on September 10, 1974, as well as how he procured the Timex watch, the respondent also indicated that there was a motive behind the Lockhart brothers' identification of him as their assailant. He testified that Carl and Ellory Lockhart falsely accused him because of a dispute over membership in a gang known as the Wayne Vice Lords. Although he was no longer a member of this gang, the respondent stated that on September 8, 1974, he attended a gang meeting in which he overheard the Lockhart brothers remark that some gang members were going to "ambush" him. Subsequent to this meeting, the respondent was accosted by a member of the gang. Moreover, when he was taken to the police station following his arrest for the instant offense, he stated that Carl and Ellory Lockhart personally informed him that they had "set him up."

In an attempt to buttress the respondent's position regarding his presence at the time of the incident and how he procured the Timex watch, testimony was elicited from three members of the band to which he belonged, namely, Solomon Bannister, Robert Jackson, and Jeffrey Keith. These individuals respectively stated that the respondent (1) stayed overnight in the basement of the Jackson home, (2) was present until 11:30 a.m. on the morning in question, and (3) not only informed the other band members at a rehearsal conducted on August 30, 1974, that he won the Timex watch while gambling but that he offered to sell it to two members of the band. Although such testimony tended to corroborate the respondent's version concerning where he was at the time of the robbery and how he acquired the watch, each witness indicated on cross-examination that he had not seen the face of the watch, but only the silver band attached to it. Moreover, two band members (Solomon Bannister and Robert Jackson) testified on cross-examination that since they were

not awake at 9:30 a.m. on the day of the robbery and there was a basement door, it was possible that the respondent could have departed and then returned to such locale prior to 11:30 a.m. when they eventually awoke. Further, even though the other band member (Jeffrey Keith) testified that he awoke at 9 a.m. on September 10, 1974, and that the rest of the band members were sleeping, on cross-examination, he seemed confused as to the date which the group slept overnight at the Jackson home.

Upon conclusion of the evidence presented by both sides as well as their respective closing argument in which the State, on its own volition, moved to dismiss the third and fourth counts of its petition, the juvenile court found the respondent delinquent on the first two counts and scheduled a dispositional hearing for October 16, 1974. On that date, the probation officer, subsequent to reporting that the respondent had a history of gang activities which resulted, on more than one occasion, in his arrest and that he was not attending high school, recommended that he be committed to the Department of Corrections. This recommendation received opposition from the respondent's uncle, Eunice Burks, who requested that his nephew be placed in his custody because the respondent was doing well ever since he (Mr. Burks) began working with him. After hearing such proposals as well as the comments proffered by the State, the respondent, his counsel and mother, the juvenile court committed the respondent to the Department of Corrections. On October 31, 1974, the respondent filed a notice of appeal seeking a review of the juvenile court's adjudicatory and dispositional rulings.

We first consider the respondent's contention that he was not proven delinquent beyond a reasonable doubt. In support of such assertion, the respondent posits that the evidence produced by the State, in particular the testimony elicited from the Lockhart brothers, is incredible, improbable and contrary to human experience. On the other hand, he claims that his own testimony regarding where he was at the time of the incident as well as how he procured the Timex watch is unequivocally logical and plausible. We are not in accord with either of these characterizations.

It is well settled in Illinois, both by legislative enactment (Ill. Rev. Stat. 1973, ch. 37, par. 704—6) and judicial edict (*e.g.*, *In re Urbasek*, 38 Ill. 2d 535, 540, 232 N.E.2d 716, 719; *In re Tucker*, 20 Ill. App. 3d 377, 380, 314 N.E.2d 276, 279) that in a juvenile proceeding, the standard of proof necessary to find a juvenile delinquent of what would be criminal conduct if charged against an adult is proof beyond a reasonable doubt. In satisfying the quantum of proof, it has been held that the testimony of a single witness, if positive and credible, is sufficient to sustain a finding of guilt in a delinquency proceeding even though such testimony is

contradicted by the accused. (*In re Littlejohn*, 24 Ill. App. 3d 40, 320 N.E.2d 449 (abstract opinion).) Moreover, even when an alibi defense is proffered, a trial judge, sitting as the trier of fact, is not obliged to believe the testimony of alibi witnesses over the positive identification of an accused, despite the fact that there are a greater number of witnesses in support of the alibi. (*In re Williams*, 24 Ill. App. 3d 593, 598, 321 N.E.2d 281, 284; accord, *People v. Jackson*, 54 Ill. 2d 143, 149, 295 N.E.2d 462, 464.) Further, where the evidence in a delinquency proceeding is merely conflicting, a reviewing court will not substitute its judgment for the trier of fact who saw and heard the witnesses testify. *In re Yates*, 35 Ill. App. 3d 829, 833, 342 N.E.2d 791, 793; see *In re Whittenburg*, 16 Ill. App. 3d 224, 227, 305 N.E.2d 363, 366.

■■ Applying these precepts to the case at bar, it is evident that the respondent's contention is untenable and implausible. In essence, the respondent's first basis of appeal poses a question of credibility of the parties' witnesses who presented conflicting evidence as to what transpired on September 10, 1974. On one hand, counsel for the respondent presented an alibi defense to the charges of robbery and how he procured the Timex watch in which testimony was elicited not only from the respondent but from three members of the band to which he belonged that (1) he was sleeping at the time the incident occurred and (2) he acquired the watch while gambling. On the other hand, the respective testimony of both Carl and Ellory Lockhart was positive and definite that the respondent had robbed them. They both indicated that there were not any impediments to their observation of the respondent while they were being victimized in the hallway of an apartment building. Besides Ellory Lockhart testifying on cross-examination that he had seen the respondent on a prior occasion, both Lockhart brothers unequivocally identified the respondent as their assailant when they toured the area of the incident with Officer Desimone on September 13, 1974. Moreover, not only did Carl Lockhart identify the watch the respondent was wearing at the time of his arrest as the one taken from him in the robbery, but such watch matched the description Carl gave to the police when they interviewed him on September 12, 1974. In light of such positive identification of the respondent as well as the trial court, who saw and heard the witnesses, being in a better position to ascertain who was telling the truth, we cannot conclude that the evidence was so unreasonable, improbable or unsatisfactory so as to create a reasonable doubt of the respondent's guilt. Hence, the mere fact there was a conflict in the evidence elicited at the delinquency proceeding does not, by itself, warrant the reversal of the finding made by the trier of fact.

We further believe there is no merit to the respondent's contention that the trial court abused its discretion when it committed him to the

Department of Corrections without seriously considering the alternate plan proposed by his uncle. As revealed in the record, subsequent to the probation officer recommending at the dispositional hearing that the respondent be committed to the Department of Corrections in light of his prior history of gang activities as well as the inability of his parents to control him when he was on the street, the juvenile court attentively listened to the plan submitted by the respondent's uncle, Eunice Burks. Mr. Burks addressed the court at considerable length in which he related that he had worked with the respondent and a youth group for the last eight months. During such time, he stated that his nephew was doing very well and had assisted him in training other children how to sing, dance and engage in other constructive endeavors. Moreover, he informed the court that if he was given custody of the respondent, the latter would eventually go back to high school as well as work for him. He also assured the court that if his plan was accepted, he would guarantee the respondent's safety seven days a week.

Besides allowing Mr. Burks to submit his proposal, the record disclosed that the juvenile court not only questioned him concerning his plan, but it heard extensive argument from the respondent's attorney in support of Mr. Burks' recommendation. Subsequent to counsel for the respondent requesting that Mr. Burks be awarded custody of his nephew for the purpose of the latter's rehabilitation, the juvenile court commented that even though it did not have any reservation concerning the uncle's capabilities, it did feel he was being partial in his evaluation of his nephew. Instead, the court felt that in view of the contents of the report submitted by the probation officer, who was a disinterested person and whose primary duty entailed the rehabilitation of the respondent, it was inclined to commit the respondent to the Department of Corrections.

Based on the above evidence, we are of the opinion that the juvenile court did not treat Mr. Burks' alternate plan in a perfunctory manner. The record unequivocally evinced that (1) Mr. Burks and counsel for the respondent were afforded ample opportunity to respectively demonstrate the merits of the former's plan for the rehabilitation of his nephew; and (2) the court not only elicited information from Mr. Burks about his proposal, but weighed such recommendation against the one submitted by an impartial probation officer before committing the respondent to the Department of Corrections. In light of such consideration of Mr. Burks' plan, we therefore conclude that the trial court did not abuse its discretion in reaching its conclusion at the dispositional hearing.

■■ The respondent's final contention is that the juvenile court was without jurisdiction to enter a dispositional order since he was never adjudged a ward of the court pursuant to section 4—8(2) of the Juvenile Court Act. (Ill. Rev. Stat. 1973, ch. 37, par. 704—8(2).) While both the

State and counsel for the respondent proffer legislative as well as judicial tenets in support of their respective positions concerning whether a juvenile court must make an explicit adjudication that a minor be deemed a ward of the court before it enters a dispositional order, such issue was recently considered on review and resolved in the affirmative. In *In re Barr*, 37 Ill. App. 3d 10, 13, 344 N.E.2d 517, 519, it was held that the Juvenile Court Act requires an explicit adjudication that a minor be made a ward of the court before any dispositional order is entered.

Considering such legal precept, it is apparent that the respondent's contention is valid. As revealed in the record, once the juvenile court found the respondent delinquent at the adjudicatory hearing, it proceeded to schedule a dispositional hearing without deciding whether it would be in the best interests of the respondent and the public to declare him a ward of the court. While the State contends that the language in the juvenile court's standard form dispositional order, stating that "all statutory prerequisites have been complied with," sufficiently evinced that the respondent had been adjudged a ward of the court, such assertion was expressly rejected by the reviewing court in *Barr* as not constituting an explicit adjudication. Thus, consistent with the mandate enunciated in *Barr*, this cause is remanded with directions that the juvenile court ascertain whether it was in the best interests of the respondent and the public that the respondent be adjudged a ward of the court. If such an adjudication is made, the juvenile court may then order the minor be committed to the Department of Corrections. If the court finds the minor should not be adjudged a ward of the court, then the petition shall be dismissed and the minor discharged from custody. The court shall enter its findings of record.

Affirmed in part and remanded with directions.

ADESKO and DIERINGER, JJ., concur.