*In re* JACK HATFIELD, a Minor.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* JACK HATFIELD, Respondent-Appellant.)

First District (4th Division)   No. 77-1760

Opinion filed May 10, 1979.—Rehearing denied June 13, 1979.

Ralph Ruebner and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Francis X. Speh, Jr., and Ira H. Raphaelson, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LINN delivered the opinion of the court:

A petition for adjudication of wardship was filed in the Circuit Court of Cook County, alleging that the minor respondent, Jack Hatfield, was delinquent in that he had committed the offenses of armed robbery (Ill. Rev. Stat. 1977, ch. 38, par. 18—2) and burglary (Ill. Rev. Stat. 1977, ch.

38, par. 19—1). At the conclusion of an adjudicatory hearing, respondent was found guilty of both robbery (Ill. Rev. Stat. 1977, ch. 38, par. 19—1) and burglary and adjudged a ward of the court. Following a dispositional hearing, respondent was committed to the Juvenile Division of the Department of Corrections.

Respondent appeals, contending: (1) that the trial court erred: (a) in permitting the introduction of hearsay testimony; and (b) in admitting evidence of other crimes; (2) that his acts of delinquency were not proved beyond a reasonable doubt; (3) that he was denied due process of law when the State failed to disclose to him certain physical evidence before trial, and (4) that the trial court abused its discretion in committing him to the Department of Corrections.

We affirm the trial court.

At the hearing on the delinquency petition, Walo Yuk testified through an interpreter. Yuk stated that on April 22, 1977, he lived in a second-floor apartment located at 1047 West Leland Avenue, Chicago, Illinois. At approximately 11:45 p.m. that night, a boy, later identified as the respondent, broke down the front door of the apartment building. When respondent was unable to open the door to Yuk's apartment, he went outside, climbed the wall to Yuk's apartment window, broke the glass and entered the bedroom. Yuk was questioned further:

"Q. * * * [D]o you see the person who climbed in the window.

A. Yes.

Q. Mr. Yuk would you point to the person who climbed in the window.

* * *

A. Look like him [pointing to respondent].

Q. Mr. Yuk, is that the man who climbed in the window?

A. Yes."

Yuk testified that as respondent was climbing up the outside wall of the building, two boys standing on the grgund below were urging respondent to come down. Respondent was wearing a cap and a light colored jacket the night of the incident.

After gaining access to the bedroom, respondent took $45 from Yuk and exited through the front door. Yuk testified, over defense counsel's objection, that respondent had robbed him five to six times before.

On cross-examination, Yuk described respondent's clothing on the night of the robbery as a light-blue shirt, light-brown jacket and a yellow-white "cap" with a 2-3 inch brim. Yuk stated further that just prior to the incident he was sitting at a table eating and drinking coffee with the apartment lights out.

Yuk testified that his bedroom has two windows which face Leland Avenue. A "little bit" of light enters these windows from two nearby

lamps. In addition, the light fixture in the hall, outside Yuk's apartment, is on at night and is located about four to five feet from Yuk's front door. Yuk testified that he was 62 years old at the time of trial, that he had never worn glasses in his life and that he had his eyes checked in 1976. Yuk stated that the first time he saw respondent following the robbery was two weeks later.

On re-direct examination, Yuk identified People's Exhibit No. 1 as the cap worn by respondent the night of the robbery. Defense counsel objected to the admission of this exhibit into evidence on the basis that it had not been produced by the State pursuant to discovery. The trial court overruled the objection.

Rose Keeler testified that she lives in a third-floor apartment at 1047 West Leland Avenue. She knows Yuk and can see his apartment from her window. On the evening of April 22, 1977, Ms. Keeler was sitting in her living room with a friend, Ruth Monini. At approximately 11:45 p.m., Ms. Keeler heard a "loud banging" noise. She walked to her bedroom and looked out an opened window to see what was going on. Ms. Keeler saw a boy "coming out of the front door [of the building], * * * walking down to the corner * * *, stopping, turning around, * * * coming back and looking up at the windows." Ms. Keeler identified respondent in court as this boy. She stated further that she had known respondent "for many years."

Ms. Keeler testified that after glancing at the windows, respondent began climbing up the wall. She was questioned further on this point:

"Q. Miss Keeler, is it possible to climb a wall of a building like that?

A. It has little things where you put toehold on and you climb—

Q. Have you seen people climb this wall before?

A. Yes."

When respondent reached Yuk's second floor apartment he used some type of object to break the window. Ms. Keller immediately went to a nearby desk to phone police. Upon concluding the call, she walked back to the window and saw respondent run out the front door of the building, fall and drop his hat. Ms. Keeler identified People's Exhibit No. 1 as this hat. Respondent climbed to his feet and ran around the corner of the building into an alley.

Approximately five minutes after seeing respondent run out of the building, Ms. Keeler arrived at Yuk's apartment. Ms. Monini, Mr. Matthews and a Chicago police officer were already there. Ms. Keeler stated that Yuk appeared "very, very upset." Ms. Keeler also testified, over defense counsel's hearsay objection, that Yuk told her the boy "Jack" had robbed him again. Ms. Keeler accompanied Yuk to the police station where a complaint was signed. She admitted talking to a police officer at

the station but denied telling anyone she saw respondent jump out of Yuk's apartment window.

On cross-examination, Ms. Keeler stated that when she first saw Yuk in the apartment she asked if he was hurt. Yuk said he was all right. She then asked if respondent had robbed him. Yuk answered that "yes, [respondent] had robbed him again."

Ms. Keeler testified that she had called her friend, Ms. Monini, to the bedroom window when she saw respondent climbing up the outside wall. There were times when Ms. Keeler and Ms. Monini looked out the bedroom window together, and times when they looked out the window separately. Ms. Keeler testified that respondent was wearing a tan or brown coat the night of the robbery. Ms. Keeler also stated that the day after the robbery she saw Randy Sturgill wearing this same jacket. Later, however, Ms. Keeler recanted this testimony and stated that Sturgill was not wearing the jacket. Rather, Sturgill had told her that he had given his tan jacket to respondent the day of the robbery.

Ms. Keeler stated that she harbored no ill feelings toward respondent. She denied having an argument with respondent's mother over money or missing groceries. While she had a vague recollection of a dispute between her son and respondent, that occurred "years ago" and "the boys settled it between themselves."

Ruth Monini testified that on April 22, 1977, she was sitting in Ms. Keeler's living room watching television and drinking coffee. At approximately 11:45 p.m., they heard a loud knocking and banging noise. It sounded like somebody was trying to "break a door in." When the noise stopped, Ms. Keeler went to her bedroom window and looked out. Ms. Monini, meanwhile, reached the window just as Ms. Keeler had grabbed the phone on a nearby desk to call police.

As Ms. Monini looked out the open window, she observed two boys standing on the ground below. She asked them why they had torn off her window screen, "not thinking that it was Mr. Yook's [sic] screen." The boys responded: "[L]ady, please don't call the police." After repeating this request, the two boys stated: "[W]e will go up and get him."

At that moment, Ms. Monini saw a third boy run out of the building, trip over his feet, roll over in the grass and look up at the window. The boy got to his feet and ran around the corner of the building into the alley. Ms. Monini identified respondent as this boy. She testified she had known respondent since the day he moved into the building where she lives.

Following this incident, Ms. Monini "ran" to Yuk's apartment, where she found Yuk with Ed Matthews, a tenant in the building. Yuk appeared "very upset." Ms. Monini noticed that there was glass around Yuk's bed which came from a broken bedroom window. The police arrived shortly thereafter.

On cross-examination, Ms. Monini testified that she was transported to the police station following the incident. She gave two policemen the same information she testified to on direct examination. She denied telling the officers she saw respondent jump out of Yuk's apartment window. Ms. Monini testified that on the night of the robbery, respondent wore a light brown jacket and dark brown pants. He was not wearing a hat.

On re-direct examination, the following colloquy took place:

"Q. Mrs. Monini, any doubt in your mind who that person was who you saw fall and roll?

A. Well, I couldn't say it was him [indicating the minor respondent], and I couldn't say it wasn't.

* * *

Q. You did see someone run out of the building?

A. Yes sir.

Q. Who was that person?

* * *

A. Jack Hatfield."

Police Officer Charles Pearson testified that on April 22, 1977, at approximately 11:45 p.m., he received a radio dispatch of a burglary in progress at 1047 West Leland. Upon arriving at the scene, he found a number of excited people standing in the street. They told him that three or four boys had just robbed an old man in the building and had run across the alley to a second floor apartment.

Pearson and three other policemen proceeded to the second floor apartment. As Pearson knocked on the front door, one of the boys threw the door open and bolted down the stairs. Upon entering the apartment, Pearson found one boy standing in the living room with his hands above his head, a second boy hiding in a closet and a third boy lying behind the couch. Pearson identified respondent as the boy they found lying behind the couch.

Pearson was asked what occurred next:

"A. Okay, at that point we took all three offenders from the apartment and went back to the scene, where Hatfield was identified by two ladies that were on the scene. Mr. Yook [sic] came up and he nodded his head. It was very hard to communicate with him. He nodded his head that those were the offenders that had just robbed him."

The police transported Yuk, the three boys and the various witnesses to the 23d District police station. Pearson testified that Yuk identified respondent again at the station.

On cross-examination, Pearson stated that the apartment where the offenders were apprehended belonged to Randy Sturgill. No proceeds of the robbery were recovered from the apartment. Pearson was not sure if

Ms. Monini and Ms. Keeler had told him respondent jumped out of Yuk's apartment window. However, according to Pearson's police report, the two ladies gave him that information. On redirect examination, Pearson testified that the night respondent was arrested he was wearing a tan jacket and blue jeans.

Following the close of Pearson's testimony, both sides rested. A directed verdict was granted in respondent's favor on the armed robbery count. The trial court found respondent guilty of burglary and robbery. In rendering its judgment, the trial court stated:

> "I find the testimony of the complainant, Mr. Yook [sic] and the testimony of Ms. Keeler to be clear, to be convincing, and I find their identification of this minor respondent to be positive."

At the dispositional hearing, a probation officer disclosed that respondent had been the subject of three prior truancy petitions filed December 3, 1970, April 19, 1973, and March 27, 1975. As a result of two of those petitions, respondent was committed to the Chicago Parental School. In addition, respondent was the subject of three previous delinquency petitions. In November 1975, a delinquency petition charging respondent with theft was dismissed without prejudice. In December 1975, respondent entered an admission to count one of a delinquency petition charging him with burglary, aggravated battery and intimidation. He was placed under supervision for six months. In April 1976, a delinquency petition charging respondent with strong-arm robbery was dismissed without prejudice. Finally, respondent had five station adjustments between 1970 and 1975 for burglary, disorderly conduct, criminal trespass to property and two runaways.

The probation officer recommended respondent be placed on probation. After hearing the social reports and statements by respondent's mother and girlfriend, the trial court committed respondent to the Juvenile Division of the Department of Corrections. The trial court found that respondent was beyond the control of his mother and that such a commitment was in his best interest and in the best interest of the community at large.

Respondent appeals.

OPINION

I

Initially, respondent contends the trial court committed reversible error when it allowed the introduction of hearsay testimony.

Ms. Keeler testified, over defense counsel's hearsay objection, that shortly following the robbery, Yuk told her respondent had robbed him again. Respondent claims that Yuk's out-of-court statement was not a

spontaneous declaration and was, therefore, inadmissible hearsay. We disagree.

For a statement to qualify as a spontaneous declaration, three elements must be present: (1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) absence of time to fabricate; and (3) the statement must relate to the circumstances of the occurrence. *People v. Robinson* (1978), 73 Ill. 2d 192, 383 N.E.2d 164.

There can be little dispute that the breakin and robbery occurrence was sufficiently startling to render Yuk's normal reflective thought processes inoperative. Ms. Monini, Ms. Keeler and Police Officer Pearson all testified that shortly following the robbery, and even later down at the station, Yuk was "very very" nervous and upset. With reference to the third factor listed above, Yuk's statement, identifying the robbery offender, was clearly related to the circumstances of the occurrence.

Finally, when Yuk made the out-of-court statement there had not been enough time for reflection and invention. The statement was made five minutes after respondent had broken into and confronted Yuk in his apartment. We are aware that the time factor of the spontaneous declaration exception is an elusive element that will vary with the particular facts of each case.

> "Perhaps an accurate rule of thumb might be that where the time interval between the event and the statement is long enough to permit reflective thought, the statement will be excluded in the absence of some proof that the declarant did not in fact engage in a reflective thought process. Testimony that the declarant still appeared 'nervous' or 'distraught' and that there was a reasonable basis for continuing emotional upset will often suffice." (McCormick on Evidence §297, at 706 (Cleary 2d ed. 1972).)

Although we are not prepared to say that five minutes in this case was sufficient to permit Yuk to engage in a reflective thought process, the evidence did establish that Yuk was nervous and distraught at the time the statement was made, and there was a reasonable basis for his continuing emotional upheaval. In our view, Yuk's out-of-court statement was a spontaneous reaction to the robbery.

Respondent points out that Yuk's out-of-court statement was made in response to an inquiry by Ms. Keeler. However, a statement in answer to a question does not necessarily violate the spontaneous declaration exception. The important consideration is the spontaneity of the statement, however elicited. *People v. Montgomery* (1974), 19 Ill. App. 3d 206, 311 N.E.2d 361.

Respondent contends that the testimony of Police Officer Pearson concerning the out-of-court identification made by Yuk, Ms. Keeler and

Ms. Monini was inadmissible hearsay. The record reveals that respondent did not raise a hearsay objection when Pearson's testimony was introduced into evidence. Therefore, the objection being waived, the testimony was properly considered and given its natural probative effect. (*People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733; *Town of Cicero v. Industrial Com.* (1949), 404 Ill. 487, 89 N.E.2d 354.) We also note that respondent did not raise the issue of plain error in either his main brief or his reply brief. Ill. Rev. Stat. 1977, ch. 110A, par. 341(e)(7).

■■ In view of the strong in-court identifications of respondent by Yuk, Ms. Monini and Ms. Keeler, and considering the fact that respondent presented no evidence or theory of defense, even if we were to hold (which we do not) that the above testimony of Ms. Keeler and Police Officer Pearson did constitute inadmissible hearsay, this error would be harmless, rather than prejudicial, and would not warrant the reversal of respondent's conviction. *People v. Overton* (1976), 44 Ill. App. 3d 490, 358 N.E.2d 393; *People v. Daliege* (1976), 40 Ill. App. 3d 706, 352 N.E.2d 247.

## II

Respondent contends the trial court erred in admitting evidence that he committed offenses other than the one for which he was tried. We disagree.

■■ Evidence of other crimes is not admissible to establish a probability of respondent's guilt by inferring that he is a man of criminal disposition and therefore had a propensity to commit the crime charged. (*People v. Lehman* (1955), 5 Ill. 2d 337, 125 N.E.2d 506; *People v. Cole* (1963), 29 Ill. 2d 501, 194 N.E.2d 269.) Such an inquiry is precluded not for lack of probative value (*Michelson v. United States* (1948), 335 U.S. 469, 93 L. Ed. 168, 69 S. Ct. 213; *People v. Lehman* (1955), 5 Ill. 2d 337, 125 N.E.2d 506), but because it may overpersuade and cause the respondent to be convicted as an "evil person" worthy of punishment rather than because he is guilty of the crime charged (1 Wharton's Criminal Evidence §240 (13th ed. 1972); 1 Wigmore on Evidence §57 (3d ed. 1940)).

■■ Evidence of other crimes may be admissible, however, if offered for some other purpose, such as to prove motive, intent, identity, absence of mistake or accident, *modus operandi* or any fact in issue. (*People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489; *People v. Harvey* (1957), 12 Ill. 2d 88, 145 N.E.2d 88.) In this case, respondent's prior robberies of Yuk were admissible to establish a basis for Yuk's identification of respondent as the person who robbed him the night of April 22, 1977.

Respondent argues that even if this evidence was admissible on the issue of identification, it "should have been limited to the fact that [Yuk] had seen [respondent] previously and should not have included reference

to the * * * [prior] robberies." (See *People v. Butler* (1975), 31 Ill. App. 3d 78, 334 N.E.2d 448.) Assuming, without deciding, the correctness of respondent's contention, any error committed in this regard was harmless. Respondent was not tried by a jury in this case but was accorded a bench trial. And the able and experienced trial judge carefully indicated that the evidence of prior robberies was not admitted as proof of respondent's propensity to commit the crime charged.

## III

Respondent contends he was denied due process of law when the State failed to disclose certain physical evidence to him before trial. Yuk and Ms. Keeler identified People's Exhibit No. 1 as the cap worn by respondent the night of the robbery. Defense counsel objected to the admission of this exhibit into evidence on the basis that it had not been produced by the State pursuant to discovery. The trial court overruled the objection.

In *Brady v. Maryland* (1963), 373 U.S. 83, 87, 10 L. Ed. 2d 215, 218, 83 S. Ct. 1194, 1196-97, the United States Supreme Court held that "the suppression by the prosecution of evidence *favorable* to an accused *upon request* violates due process where the evidence is *material*[1] either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (Emphasis added.) Although *Brady* does not define at what point in the proceedings disclosure is to be made (*Brady v. Maryland And The Prosecutor's Duty to Disclose*, 40 U.Chi. L. Rev. 112, 117-20 (1972)), in Illinois pretrial disclosure is the rule (Ill. Rev. Stat. 1977, ch. 110A, par. 412(c); *People v. Parton* (1976), 40 Ill. App. 3d 753, 354 N.E.2d 12).

In addition, while *Brady* generally "involves the discovery, after trial, of information which had been known to the prosecution but unknown to the defense" (*United States v. Agurs* (1976), 427 U.S. 97, 103, 49 L. Ed. 2d 342, 349, 96 S. Ct. 2392, 2397), the government's late disclosure of *Brady* material to the defendant in the midst of trial may also give rise to a constitutional due process violation (compare *People v. Tate* (1976), 63 Ill. 2d 105, 345 N.E.2d 480, with *People v. Elston* (1977), 46 Ill. App. 3d 103, 360 N.E.2d 518, and the cases cited therein).

---

[1] "Although the Court's use of the term 'material' could at the time have been taken to mean only that the evidence must be relevant, lower courts, and the Supreme Court itself * * *, have read into the word a standard for the degree of harm that the suppression must have caused the defendant to require the reversal of his conviction." *Brady v. Maryland And The Prosecutor's Duty to Disclose*, 40 U.Chi. L. Rev. 112, 125 (1972); see, *e.g.*, *Moore v. Illinois* (1972), 408 U.S. 786, 33 L. Ed. 2d 706, 92 S. Ct. 2562.

The Supreme Court clarified this point in *United States v. Agurs* (1976), 427 U.S. 97, 104, 49 L. Ed. 2d 342, 350, 96 S. Ct. 2392, 2398, when it stated:

"A fair analysis of the holding in *Brady* indicates that implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial."

■■ To establish a *Brady* violation in the context of this case, respondent must show:

> (1) that evidence which actually existed (*People v. Godbout* (1976), 42 Ill. App. 3d 1001, 356 N.E.2d 865),
>
> (2) in the possession of the prosecution (*People v. Gaitor* (1977), 49 Ill. App. 3d 449, 364 N.E.2d 484),
>
> (3) was "favorable" to him (*People v. Middleton* (1976), 38 Ill. App. 3d 984, 350 N.E.2d 223); and
>
> (4) that the prosecutor failed to disclose this evidence in response to a "specific" request (*People v. Jones* (1977), 66 Ill. 2d 152, 361 N.E.2d 1104).[2]

The requisite showing has not been made in this case.

■■ Respondent has not demonstrated that the cap is evidence "favorable" to him. (See *People v. Hudson* (1968), 38 Ill. 2d 616, 624, 233 N.E.2d 403, 407 ("There is no proof here that such evidence could be favorable to the defense").) The constitution does not require that the prosecutor lay open his entire file to defense counsel. (*United States v. Agurs* (1976), 427 U.S. 97, 106, 108-10, 49 L. Ed. 2d 342, 351, 352-53, 96 S. Ct. 2392, 2399, 2400; *United States v. Baxter* (9th Cir. 1973), 492 F.2d 150, 173, *cert. denied* (1974), 416 U.S. 940, 40 L. Ed. 2d 292, 94 S. Ct. 1945; *United States v. Ruggiero* (2d Cir. 1973), 472 F.2d 599, 604, *cert. denied* (1973), 412 U.S. 939, 37 L. Ed. 2d 398, 93 S. Ct. 2772; *Commonwealth v. Royster* (1977) 472 Pa. 581, 372 A.2d 1194; see *United States v. Garsson* (S.D.N.Y. 1923), 291 F. 646, 649.) Due process requires only that the prosecutor disclose:

> (1) exculpatory evidence which tends to negate the guilt of the accused; or, stated affirmatively, supports the innocence of the defendant (*People v. Elston* (1977), 46 Ill. App. 3d 103, 360 N.E.2d 518; Ill. Rev. Stat. 1977, ch. 110A, par. 412(c));
>
> (2) impeachment evidence which tends to discredit the credibility of a government witness (*People v. Dixon* (1974), 19 Ill. App. 3d 683, 312 N.E.2d 390); and
>
> (3) mitigation evidence which tends to support a reduction of the punishment imposed (*Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194; Ill. Rev. Stat. 1977, ch. 110A, par. 412(c)).

---

[2] This is not to suggest that a general request completely relieves the prosecutor of his obligation to disclose exculpatory evidence to the defense. "[T]here are situations in which evidence is obviously of such substantial value to the defense that elementary fairness requires it to be disclosed even without a specific request." (*United States v. Agurs* (1976), 427 U.S. 97, 110, 49 L. Ed. 2d 342, 353-54, 96 S. Ct. 2392, 2401.) This disclosure obligation, however, is limited to evidence which is either "obviously exculpatory" (*United States v. Agurs* (1976), 427 U.S. 97, 107, 49 L. Ed. 2d 342, 351, 96 S. Ct. 2392, 2399), or "highly probative of innocence" (*United States v. Agurs* (1976), 427 U.S. 97, 110, 49 L. Ed. 2d 342, 353, 96 S. Ct. 2392, 2400).

■ The mere fact that a piece of evidence may be *helpful* to the defendant does not mean it is "favorable" in the constitutional sense. There is little in the prosecutor's file which might not aid the defendant in some remote or fanciful way in the preparation of his case. (See *People v. Jones* (1976), 87 Misc.2d 931, 387 N.Y.S. 2d 779, *aff'd* (1978), 44 N.Y.2d 76, 404 N.Y.S.2d 85, 375 N.E.2d 41.) However, the purpose of *Brady* is not to provide the defendant with a complete disclosure of all the evidence in the government's file. (*Williams v. Wolff* (8th Cir. 1973), 473 F.2d 1049, 1054.) Rather, it is to assure that the defendant is not denied access to "exculpatory, impeachment or mitigation evidence" in the possession of the government.

Knowledge of incriminating evidence would often be helpful to an accused in preparing his witnesses and in choosing what defense to present. However, the prosecutor's failure to disclose incriminating evidence to the defendant will generally not serve as a basis for a *Brady* claim. *People v. Middleton* (1976), 38 Ill. App. 3d 984, 350 N.E.2d 223; see *Weatherford v. Bursey* (1977), 429 U.S. 545, 559-60, 51 L. Ed. 2d 30, 42, 97 S. Ct. 837, 845-46; *United States v. Agurs* (1976), 427 U.S. 97, 112 n. 20, 49 L. Ed. 2d 342, 354-55 n. 20, 96 S. Ct. 2392, 2401 n. 20.

"Neutral evidence," on the other hand, *i.e.*, material or information which, at the time disclosure is requested, neither inculpates nor exculpates the defendant, but which *may* form the basis for a favorable defense argument, must be disclosed under *Brady*. *People v. Nichols* (1976), 63 Ill. 2d 443, 349 N.E.2d 40; see *Patler v. Slayton* (4th Cir. 1974), 503 F.2d 472.

● 9 The cap in this case was clearly incriminating evidence as two eyewitnesses for the State identified the cap as the one respondent wore the night of the robbery. Furthermore, the cap does not tend to negate respondent's guilt or support his theory of defense; it does not tend to impeach any of the State's witnesses; and it does not serve to mitigate the punishment imposed. There has been no showing by respondent that this incriminating evidence could have provided the basis for a favorable defense argument. (*People v. Parton* (1976), 40 Ill. App. 3d 753, 759-61, 354 N.E.2d 12, 17-18 (Green, J., dissenting in part).) Consequently, the prosecutor's decision not to disclose the cap to the defendant before trial was not a violation of *Brady*.

Although it has not been raised or argued by respondent in his briefs on appeal, we are aware that respondent did have a distinct statutory, as opposed to a *Brady*, right to pretrial discovery of the cap in this case. Supreme Court Rule 412(a)(v) expressly provides:

> "a. * * * [T]he State shall, upon written motion of defense counsel, disclose to defense counsel the following material and information within its possession or control:

* * *

(v) any * * * tangible objects which the prosecuting attorney intends to use * * * [at] trial * * *." Ill. Rev. Stat. 1977, ch. 110A, par. 412(a)(v).

The problem we confront is respondent's failure to either raise or argue this statutory violation as a basis for the reversal of his conviction. As we recently stated in *People v. Jimerson* (1979), 69 Ill. App. 3d 403, 412-13:

"When a defendant seeks reversal, theories not pursued nor advanced with citation of authorities are deemed waived. [Citations.]"

This waiver principle is not to be lightly disregarded. *Saldana v. Wirtz Cartage Co.* (1978), 74 Ill. 2d 379, 385 N.E.2d 664.

Even if we were to reach the statutory discovery violation, however, we find that it would have been, at most, harmless error. See *People v. Curtis* (1977), 48 Ill. App. 3d 375, 362 N.E.2d 1319; *People v. Tribbett* (1967), 90 Ill. App. 2d 296, 232 N.E.2d 523, *aff'd* (1968), 41 Ill. 2d 267, 242 N.E.2d 249.

## IV

■■ Respondent next contends that his acts of delinquency were not proved beyond a reasonable doubt. (Ill. Rev. Stat. 1977, ch. 37, par. 704—6; *In re Urbasek* (1967), 38 Ill. 2d 535, 232 N.E.2d 716.) In view of the three strong in-court identifications of respondent, we find this contention to be without merit. *In re Smith* (1976), 40 Ill. App. 3d 248, 352 N.E.2d 317.

## V

Finally, respondent contends the trial court erred when it committed him to the Juvenile Division of the Department of Corrections. We do not agree.

■■ Once a juvenile is found delinquent, various dispositional alternatives are available. (Ill. Rev. Stat. 1977, ch. 37, par. 705—2.) The juvenile's disposition rests within the sound judicial discretion of the trial court and will not be disturbed absent an abuse of that discretion. *In re Wilson* (1976), 40 Ill. App. 3d 619, 352 N.E.2d 251.

Before committing respondent to the Department of Corrections, the trial court: (1) carefully weighed the evidence presented to it, including the probation officer's recommendation of probation; and (2) considered the various dispositional alternatives. The trial court concluded that commitment was in respondent's and the community's best interest. We cannot say that this was in any way an abuse of discretion. *In re Buchanan* (1978), 62 Ill. App. 3d 463, 379 N.E.2d 122.

Accordingly, for the reasons stated, we affirm the judgment of the trial court.

Affirmed.

JOHNSON and ROMITI, JJ., concur.